Manley ABERCROMBIE, Robert Q. Calloway, Richard F. Eckel, Donald E. Hedrick, and E. Weston Sloan, directors of the Rushville National Bank, Petitioners,

v.

Robert L. CLARKE, Comptroller of the Currency, Respondent.

No. 89–2407.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 24, 1990.

Decided Dec. 26, 1990.

Rehearing and Rehearing En Banc Denied Jan. 23, 1991.

Wayne Hartke, Hartke & Hartke, Falls Church, Va., for petitioners.

Allise K. Jutras, Comptroller of the Currency, Enforcement & Compliance Div., James F. Gillespie, Jr., Office of the Comptroller of the Currency, Litigation Div., Washington, D.C., for respondent.

Before BAUER, Chief Judge, and RIPPLE and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

The petitioners (referred to collectively as the Directors) served during the relevant period as directors of the Rushville National Bank of Rushville, Indiana (Bank). They seek review of a decision of the Comptroller of the Currency (Comptroller) that assessed civil money penalties against

them for violations of cease and desist orders. For the following reasons, we affirm the decision of the Comptroller.

## I BACKGROUND

### A. *Statutory Authority*

The Comptroller is authorized to order banks and their directors to cease and desist from any violations of law or "unsafe or unsound practice." 12 U.S.C. § 1818(b)(1). Such cease and desist orders may be imposed by consent or may be mandated after a hearing. *Id.* The Comptroller has discretionary authority to seek enforcement of cease and desist orders in actions brought in federal district courts, *id.* § 1818(i)(1), or to impose civil money penalties for violation of such orders, *id.* § 1818(i)(2). For the period in question, the provision authorizing civil money penalties read in pertinent part:

> Any insured bank which violates or any officer, director, employee, agent, or other person participating in the conduct of the affairs of such a bank who violates the terms of any order which has become final and was issued pursuant to subsection (b), (c), or (s) of this section, shall forfeit and pay a civil penalty of not more than $1,000 per day for each day during which such violation continues.... As used in this section, the term "violates" includes without any limitation any action (alone or with another or others) for or toward causing, bringing about, participating in, counseling, or aiding or abetting a violation.

*Id.* § 1818(i)(2)(i).[1] The amount of the penalty was to reflect "the size of financial resources and good faith of the insured bank or person charged, the gravity of the violation, the history of previous violations, and such other matters as justice may require." *Id.* § 1818(i)(2)(ii).

The statute also set out certain procedural requirements. It required the Comptroller to issue a written notice, *id.* § 1818(i)(2)(i), and permitted those receiving such notice to request an administrative hearing, *id.* § 1818(i)(2)(iii). After such a hearing, the Comptroller made a final decision with respect to penalties. Those against whom civil money penalties were assessed could petition for review by the court of appeals. *Id.* § 1818(i)(2)(iv).

### B. *Procedural History*

#### 1. Initial administrative proceedings

Pursuant to 12 U.S.C. § 1818(b)(1), the Comptroller and the Bank, through the Directors, entered into a cease and desist order (Consent Order) on June 29, 1983. This Consent Order consisted of sixteen articles, which outlined steps that the Directors were to take to improve the safety and soundness of the Bank. Additional examinations and meetings between regulators and the Directors followed. Regulators expressly warned the Directors that they faced the assessment of civil money penalties if they failed to comply with the Consent Order. An amended Consent Order was agreed to on June 19, 1984. Regulators continued to find violations of the amended Consent Order. For example, the January 31, 1985 examination[2] found violations of ten articles. The letter transmitting the report of this evaluation to the Directors again warned them that they faced the assessment of civil money penalties. Moreover, on June 21, 1985, each Director was sent a letter notifying him that the Comptroller was

> considering whether to assess civil money penalties against the individual members of the Board of Directors.... Any such assessment will be founded upon our determination that the individual members of the Board of Directors vio-

---

**1.** Subsequent to the events involved in this case, Congress amended section 1818 to provide for larger daily civil money penalties. *See* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, § 907(a), 103 Stat. 183, 462–64 (codified at 12 U.S.C.A. § 1818(i)(2) (West 1989)). Unless otherwise noted, all references to section 1818 in the text are to the version in effect during the relevant period.

**2.** The examination was actually conducted in February and March 1985, but is referred to as the January 31, 1985 examination because that is the final date for which financial information was evaluated.

lated the provisions of 12 U.S.C. § 1818 by failing to substantially comply with the Order to Cease and Desist dated June 29, 1983, and its Amendment dated June 19, 1984.

Ex. OCC24 at 1.

The Comptroller issued a Notice of Assessment of a Civil Money Penalty against the Directors on October 25, 1985.[3] The October 1985 Notice indicated that the penalties were to be issued on the basis of violations of the amended Consent Order, as outlined in the report of the January 31, 1985 examination. The Notice did not specify on which days the alleged violations occurred, nor did it expressly indicate that the violations were continuing as of the date of the Notice. Director Hedrick was assessed a civil money penalty of $15,000, and Directors Abercrombie, Calloway, Eckel, and Sloan were assessed $10,000 each.[4]

The Directors requested an administrative hearing. Before the hearing could be held, however, the Directors filed a motion asking the administrative law judge (ALJ) to dismiss the proceedings. The Directors cited *Larimore v. Comptroller of Currency*, 789 F.2d 1244 (7th Cir.1986) (en banc), for the proposition that the Comptroller lacked authority to impose personal liability against them without filing suit in district court. The Directors further argued that civil money penalties could not be assessed administratively for past violations because the use of the present tense verb "continues" in the penalty clause of 12 U.S.C. § 1818(i)(2)(i)[5] "requires the violation to be in the present tense." Respondent's [sic] Br. in Support of Their Motion to Dismiss at 2. The ALJ denied this motion.

### 2. Judicial proceedings

The Directors then filed suit in district court, seeking to enjoin the administrative proceedings. *See Abercrombie v. Office of Comptroller of Currency*, 641 F.Supp. 598 (S.D.Ind.1986). Again relying on *Larimore* and on their contention that the present tense language of subsection 1818(i)(2)(i) authorized the Comptroller to impose civil money penalties only for continuing violations, the Directors argued that the agency lacked jurisdiction to impose the penalties. *See id.* at 601. The district court concluded, however, that the court lacked jurisdiction over the Directors' action. *Id.* at 600. The court noted that 12 U.S.C. § 1818(i)(1) strictly limited the jurisdiction of courts to enjoin administrative proceedings involving civil money penalties. *Id.* Moreover, the statute provided for review of final agency action by the courts of appeal. *See id.* (citing 12 U.S.C. § 1818(i)(2)(iv)). The district court concluded that the Comptroller's actions in this case did not fall within a judicially recognized exception to subsection 1818(i)(1) because it did not involve a "clear departure from statutory authority." *Id.* (citing *Groos Nat'l Bank v. Comptroller of Currency*, 573 F.2d 889, 895 (5th Cir.1978)).

This court affirmed. *Abercrombie v. Office of Comptroller of Currency*, 833 F.2d 672 (7th Cir.1987) (*Abercrombie I*). It reasoned that the " 'statutory authority' exception" to the limitation on federal court jurisdiction found in subsection 1818(i)(1) applies only when the agency's action is " 'blatantly lawless[.]' " *Id.* at 675 (quoting *Oestereich v. Selective Serv. Sys. Local Bd. No. 11*, 393 U.S. 233, 238, 89 S.Ct. 414, 416, 21 L.Ed.2d 402 (1968)). For two reasons, this exception did not apply. First, without deciding the issue, the court observed that this case "does not appear to [be] control[led]" by *Larimore*. *Abercrombie I*, 833 F.2d at 676. In *Larimore*, the court held that the Comptroller's authority to issue cease and desist orders

---

**3.** This notice was amended to correct certain technical and typographical errors on December 5, 1985. For the sake of simplicity, we shall refer to the notices collectively as the October 1985 Notice.

**4.** Director William F. Smith was also assessed a penalty of $10,000. He settled with the Comptroller and is not a party to this appeal.

**5.** The relevant clause provided for a "civil penalty of not more than $1,000 per day for each day during which such violation continues." 12 U.S.C. § 1818(i)(2)(i).

under 12 U.S.C. § 1818(b)(1) did not authorize an order to directors personally to indemnify a bank for losses caused by violating statutory limits on the amount of loans given to any one borrower. 789 F.2d at 1245. Such an order amounted to the imposition of "personal liability" against the directors. *Id.* The court in *Larimore* reasoned that such personal liability could not be imposed administratively under subsection 1818(b)(1), but only judicially under 12 U.S.C. § 93(a).[6] *Id.* at 1256. In *Abercrombie I*, the court observed that the nature of the remedy involved in this case differed from the damages at issue in *Larimore:*

> Section 93(a) is a damages provision; it provides that bank directors may be liable to reimburse the bank or other people the directors have injured by violating banking laws. Section 1818(i)(2)(i), on the other hand, is a penalty provision designed to punish and deter violations of cease and desist orders. The Comptroller need not prove damages to collect [civil money penalties]. Here, unlike in *Larimore*, the Comptroller does not seek to have the directors reimburse the bank or any other persons for losses resulting from the directors' activities. Instead, the Comptroller simply seeks to impose a penalty on the directors; the money the Comptroller collects will go to the United States Treasury, not to the Bank or any other person. 12 U.S.C. § 1818(i)(2)(vii).

*Abercrombie I*, 833 F.2d at 676.

Second, the court in *Abercrombie I* concluded that the Comptroller's interpretation of his authority to assess civil money penalties for past violations under subsection 1818(i)(2) was not so unreasonable as to be "'blatantly lawless.'" *Id.* at 675–77. The court made clear that it was *not* deciding the merits of the Directors' complaint: "[W]e do not determine whether the Comptroller actually did or did not violate his statutory authority; we hold only that any

violation was not a clear violation." *Id.* at 675.

### 3. Additional administrative proceedings

The case thus returned to the administrative arena. On January 27, 1988, the October 1985 Notice was amended to indicate that "[e]vidence and details of the violations" were contained in reports issued both before and after the January 31, 1985 examination report. Amended Notice at 1–2. On the first day of the hearing, the ALJ insisted that the specific days of the alleged violations be identified. Tr. of Mar. 15, 1988 at 30–31. A handwritten list was prepared, indicating that the violations continued at least until April 8, 1985.

The ALJ rejected the Directors' contention that section 1818 authorized civil money penalties only for continuing violations. ALJ Recommended Decision and Order at 113. The ALJ concluded that the Consent Order had been violated, *id.* at 128, although he found no violation of two articles in the Consent Order, *id.* at 124. After taking into account the factors found in subsection 1818(i)(2)(ii), the ALJ recommended that the civil money penalty assessments be reduced to $2,000 for Director Hedrick and $1,000 each for Directors Abercrombie, Eckel, Calloway, and Sloan. *Id.* at 130.

The Comptroller then issued the final decision that is the basis of this appeal. *In re Hedrick*, No. AA–EC–85–120 (Office of the Comptroller of the Currency June 20, 1989) [hereinafter Comptroller's Decision]. The Comptroller concluded that subsection 1818(i)(2)(i) "authorizes the imposition of [civil money penalties] for past, present, and continuing violations of a cease and desist order." *Id.* at 7. The Comptroller reasoned that Congress' goals of "discourag[ing] unsound practices and [making] cease and desist orders self-enforceable" could not be served if civil money penalties

---

**6.** This statute authorizes the Comptroller to sue in district court to determine whether specified banking laws have been violated and whether the franchises of such banks should therefore be forfeited. 12 U.S.C. § 93(a). "And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation." *Id.*

were available only for ongoing violations. *Id.* "Moreover, institutions and individuals subject to an order will be less likely to change their conduct if they can violate the order repeatedly and then correct the violations when a Notice appears imminent." *Id.* at 7–8. The Comptroller also observed that there was no statutory requirement that those in violation of a cease and desist order be given time to cure their violations after the notice of assessment, for cease and desist orders themselves are "adequate notice." *Id.* at 10. Furthermore, the Comptroller concluded that the final assessment could be based on evidence of violations not charged in the original notice of assessment, provided the notice was "amended, as was done in this case," *id.* at 13, to give the Directors an opportunity to respond to the true scope of the agency's contentions. *Id.* at 14.

The Comptroller found the Directors in violation of nine of the ten articles, including one of the two articles for which the ALJ had found no violation.[7] *Id.* at 12. Violations of at least two articles of the amended Consent Order continued even after the October 1985 Notice. *Id.* at 18, 25. The Comptroller noted the duration of some of the violations:

> While no precise count has been made of the aggregate number of days that the [Directors] were in violation, the number exceeds 300 days just for Article III (requiring documentation for additional loans to criticized borrowers). For Article XII (requiring submission of budgets and operating assumptions), the violation extended . . . at least . . . 61 days.

*Id.* at 61–62 (citations omitted). While not imposing the "hundreds of thousands of dollars" of civil money penalties that the Directors thus potentially faced, *id.* at 62, the Comptroller disagreed somewhat with the ALJ's treatment of the statutory factors found in 12 U.S.C. § 1818(i)(2)(ii). For example, the ALJ had noted at least

some indications of good faith, ALJ Recommended Decision and Order at 123, and had somewhat minimized the gravity of the violations, *id.* at 124–25. The Comptroller, in contrast, found the Directors' "good faith to be seriously deficient," Comptroller's Decision at 65, and found the violations to be "more serious" than had the ALJ, *id.* at 67. The Comptroller's final assessment was $15,000 for Director Hedrick and $10,000 each for Directors Abercrombie, Calloway, Eckel, and Sloan. *Id.* at 70.

## II ANALYSIS

 The basic question before us is whether the Comptroller appropriately determined that civil money penalties could be assessed for *past* violations of cease and desist orders. The Directors contend that both the "present tense" language of the statute and its legislative history "require[ ] the conclusion that [civil money penalties] can *only* be assessed for violations which are in the 'present tense', existing at the time the Directors are given the 'Notice of Assessment' of [civil money penalties]." Petitioners' Br. at 1–2 (emphasis in original). The Comptroller, on the other hand, contends that the language authorizing civil money penalties of "not more than $1,000 per day for each day during which such violation continues" was "intended only as a limitation on the maximum amount of the penalty and was not intended to specify the types of violations for which penalties could be assessed." Respondent's Br. at 27. Alternatively, the Comptroller argues that the language "is sufficiently ambiguous as to permit that interpretation." *Id.* Furthermore, he contends that legislative history supports his interpretation of the statutory language.

### A. *Statutory Construction*

The essential task of a reviewing court that faces an issue of statutory construction is well established. We first must

---

7. The Comptroller concurred with the ALJ's conclusion that there was insufficient evidence to establish a violation of Article XVIII (requiring the Directors to notify the agency of its intended response to a consultant's report on expenses paid to insiders). Comptroller's Decision at 55–60. The Comptroller rejected, however, the ALJ's conclusion that there was insufficient evidence to find a violation of Article XII (requiring the Directors to submit detailed budget documents and operating assumptions). *Id.* at 41–45.

determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). However, if the administering agency fills a gap in the statute, the court must determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782; *see also Fort Stewart Schools v. Federal Labor Relations Auth.,* —— U.S. ——, 110 S.Ct. 2043, 2046, 109 L.Ed.2d 659 (1990); *Larimore v. Comptroller of Currency,* 789 F.2d 1244, 1248 (7th Cir.1986) (en banc) ("agency's interpretation of its authorizing statute need not be the only permissible one in order for it to be sustained").

We must begin with the language of the statute itself. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.,* 484 U.S. 49, 56, 108 S.Ct. 376, 380, 98 L.Ed.2d 306 (1987). As this court noted in *Abercrombie I,* the Directors' reading of the statutory language can be characterized as "reasonable." 833 F.2d at 676. Use of

present tense verbs throughout the subsection in question can be read as evidencing a congressional intent "to emphasize that § 1818 provides a daily penalty for continuing violations" only, not for past violations. *Id.* On the other hand, the language in question is not so clear that it can support only the Directors' interpretation. The Comptroller's interpretation of the statutory language is also a reasonable reading.[8]

Because the statutory language itself is ambiguous, we must turn to other evidence of congressional intent. Therefore, in order to determine whether the Comptroller's decision can be affirmed, we shall next consider what the legislative history and the structure of the statute reveal about the role of the civil money penalty provision in the statutory scheme.

The Comptroller was first authorized to issue cease and desist orders against individuals in 1978. *See* Financial Institutions Regulatory and Interest Rate Control Act of 1978 (FIRA), Pub.L. No. 95–630, § 107(a)(1), 92 Stat. 3641, 3649–50. FIRA also authorized the assessment of civil money penalties for violations of such orders. *Id.* § 107(e)(1), 92 Stat. at 3660.[9]

---

8. In support of their argument that the present tense language in the statute precludes penalties for past violations, the Directors have cited the Supreme Court's decision in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). The Court in *Gwaltney* held that 33 U.S.C. § 1365(a) (section 505(a) of the Clean Water Act), which authorizes citizen suits against those "alleged to be in violation," does not permit such suits "for wholly past violations." 484 U.S. at 64, 108 S.Ct. at 384–85. As one part of its rationale, the Court noted: "One of the most striking indicia of the prospective orientation of the citizen suit is the pervasive use of the present tense throughout § 505." *Id.* at 59, 108 S.Ct. at 382.

 Nonetheless, in *dicta,* the Court noted that "it is little questioned that the Administrator may bring enforcement actions to recover civil penalties for wholly past violations." *Id.* at 58, 108 S.Ct. at 381–82. Subsection 309(d) of the Clean Water Act, which authorizes the civil penalties for violations of that statute, also uses present tense language—although not the more graphic and specific "alleged to be in violation."

 Any person who violates [specified sections of the statute] and any person who violates any order issued by the Administrator under

subsection (a) of this section, shall be subject to a civil penalty not to exceed $25,000 per day for each violation.

33 U.S.C. § 1319(d).

 Consequently, we do not find *Gwaltney* contrary to the Comptroller's position. Indeed, it is somewhat supportive of his position. The language of subsection 309(d) of the Clean Water Act is virtually identical to the language of 12 U.S.C. § 1818(i)(2)(i).

9. FIRA also amended section 93 by adding a civil money penalty provision, which was similar to the provision in section 1818, for the violation of banking laws and regulations. *See* Pub.L. No. 95–630, § 103, 92 Stat. 3641, 3643–44 (1978) (codified as amended for the period relevant to this case at 12 U.S.C. § 93(b) and as further amended at 12 U.S.C.A. § 93(b) (West Supp.1990)). Subsection 93(b), unlike subsection 93(a), does not include a requirement that the Comptroller seek enforcement in the courts. The court in *Larimore v. Comptroller of Currency,* 789 F.2d 1244, 1254 (7th Cir.1986) (en banc), rejected the Comptroller's contention that section 93 thus provided an option to proceed administratively or to sue in district court when seeking to impose personal liability on di-

To support their contention that civil money penalties may be imposed only for continuing violations, the Directors point to a number of phrases from a Senate report on a bill that included provisions that ultimately became part of FIRA. As the Directors emphasize, that report indicated that the purpose of civil money penalties was "to help prevent or correct" problems that threatened "the safety or soundness" of banks. S.Rep. No. 323, 95th Cong., 1st Sess. 16–17 (1977). Similarly, civil money penalties were to serve as a "deterrent," *id.* at 8, and were to help make cease and desist orders "self-enforcing," *id.* at 9.[10] The thrust of the Directors' interpretation of the legislative history is that imposition of civil money penalties for past violations cannot serve these goals:

> How does one "deter" past acts? There is no way to deter past acts because they have already occurred, and they are not deterred because they occurred and its [sic] all over with. No amount of dollar penalty can deter a past act.

Petitioners' Br. at 36.

The Directors correctly identify the congressional concern with respect to the safety and soundness of the banks. We do not believe, however, that the legislative history, read in its entirety, supports the view that Congress saw no value in punishing past violations of an extant cease and desist order. Indeed, the same report relied on by the Directors appears to have contemplated the availability of civil money penalties for past violations, noting that they were "to be assessed *from the first*

*day of the occurrence of any violation.*" S.Rep. No. 323, 95th Cong., 1st Sess. 8 (1977) (emphasis supplied). In similar fashion, the House report noted a need to deal with bank officers "who *have committed* abuses, wherever they may be employed" at the time the Comptroller has sufficient evidence to take action. H.R.Rep. No. 1383, 95th Cong., 2d Sess. 240 (1978), U.S. Code Cong. & Admin.News 1978, pp. 9273, 9370 (minority views) (emphasis supplied). Civil money penalties also were made applicable only to violations that occurred after enactment of FIRA. *See id.* at 17–18. At first glance, this element of the legislative history might appear to support the Directors' contention. However, if the committee understood the present tense language of the statute to apply only to continuing violations, there would have been no reason to emphasize that the provision was not retroactive.

Moreover, the Directors' reading of the legislative history ignores the general deterrence function of civil money penalties. Although the Directors in this case can no longer be deterred from violating the Consent Order for the period in question, the potential of civil money penalties could have a strong deterrent effect on other bank officials and, indeed, on these bank officials in the future.

 More fundamentally, the Directors' argument that violators of a cease and desist order must be given an opportunity to comply before they incur monetary sanctions for their violation renders ineffective

---

rectors. However, as did the court in *Abercrombie I,* 833 F.2d at 876, we conclude that this case can be distinguished from *Larimore* because of the difference between the penalty provision involved here and the damages involved in *Larimore.* Moreover, subsequent to this court's decision in *Larimore,* Congress amended the cease and desist provision of section 1818 to authorize the Comptroller to order indemnification in cases involving unjust enrichment or recklessness. *See* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, § 902(a)(1)(C), 103 Stat. 183, 450 (codified at 12 U.S.C.A. § 1818(b)(6)(A) (West 1989)).

**10.** The Directors also contend that the legislative history indicated that civil money penalties

could be imposed administratively only if there existed no other " 'effective remedy.' " Petitioners' Br. at 31 (quoting S.Rep. No. 323, 95th Cong., 1st Sess. 17 (1977)). They further contend that 12 U.S.C. § 1818(i)(1), which authorizes the Comptroller to seek enforcement of cease and desist orders in district court, provided an alternative remedy and that the Comptroller thus was *compelled* to proceed under that provision or choose some other effective remedy before resorting to the imposition of civil money penalties under subsection 1818(i)(2). However, subsection 1818(i)(1) expressly gives the Comptroller "discretion" to seek judicial enforcement, and we decline to adopt the Directors' reading of congressional intent.

the role of cease and desist orders in the enforcement of the country's banking laws. If a penalty may be exacted only after the violator once again has endangered the health of the financial institution by flouting the cease and desist order, a good deal of the enforcement potential of such orders is lost. They are meant to have a "self-enforcing" effect on the banking community. Under the Directors' interpretation, it would be impossible to fulfill the congressional expectation that penalties be exacted "from the first day" of the violation. *See* S.Rep. No. 323, 95th Cong., 1st Sess. 8–9 (1977). Civil money penalties are designed to deter not only willful violations but negligent ones as well.[11] The banker under a cease and desist order operates with the knowledge that any deviation from that order—purposeful or otherwise—will result in a significant penalty—whether the authorities discover the violation immediately or later.

Although the legislative history and structure of FIRA does not prove definitively that Congress intended civil money penalties to be available for past violations, we cannot say that the Comptroller's interpretation of congressional intent is unreasonable. Indeed, there is significant support for his position. Consequently, we must conclude that the Comptroller's interpretation of his statutory authority is not impermissible. *See Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

Our conclusion to accept the Comptroller's reading of the statute is bolstered by the re-enactment of civil money penalty provisions in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (FIRREA). It is significant that these provisions continue to use present tense language.[12] *See id.* § 907(a), 103 Stat. at 462–64 (codified at 12 U.S.C.A. § 1818(i)(2) (West 1989)). Yet, it is abundantly clear that Congress intended the present tense language to apply to past acts. FIRREA provides for retroactive application of the new maximum penalties if the conduct

(1) is not already subject to a notice (initiating an administrative proceeding) . . .; and

(2) occurred after the completion of the last report of examination of the institution involved by the appropriate Federal banking agency . . . occurring before the date of the enactment of this Act.

*Id.* § 907(1), 103 Stat. at 476–77 (codified at 12 U.S.C.A. § 93 note). Although this retroactive provision would not apply to the conduct in this case, this provision does indicate that Congress did not intend to attach prospective-only effect to the present tense language in the statute.

Moreover, section 905(a) of FIRREA authorizes imposition of civil money penalties against individuals even after they have left the service of the covered institution. *Id.* § 905(a), 103 Stat. at 459 (codified at 12 U.S.C.A. § 1818(i)(3)). Thus, civil money penalties now are certainly available for past violations. The legislative history of this provision strongly suggests that it was intended as a clarification of existing authority. As the report of the House Banking, Finance and Urban Affairs Committee stated: "This provision does not create a new offense, but clarifies when the banking agencies may initiate enforcement ac-

---

**11.** *Compare* 12 U.S.C. § 93(a) (expressly proscribing *knowing* violations) *with id.* § 1818(i)(2)(i) (indicating no intent element).

**12.** *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974) ("[C]ongressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress. We have also recognized that subsequent legislation declaring the intent of an earlier statute is entitled to significant weight.") (footnotes omitted); *see also Commodity Futures*

*Trading Comm'n v. Schor*, 478 U.S. 833, 846, 106 S.Ct. 3245, 3254, 92 L.Ed.2d 675 (1986); *Geldermann, Inc. v. Commodity Futures Trading Comm'n*, 836 F.2d.310, 316 (7th Cir.1987), *cert. denied*, 488 U.S. 816, 109 S.Ct. 54, 102 L.Ed.2d 33 (1988). *But cf. International Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 571, 99 S.Ct. 790, 802, 58 L.Ed.2d 808 (1979) (Burger, C.J., concurring) (understanding of draftsman of amendment in 1970 "would have little, if any, bearing" on "construction of definitions enacted in 1933 and 1934").

tions against individuals." H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 393 (1989), U.S.Code Cong. & Admin.News 1989, pp. 86, 189.

### B. *Application to This Case*

██ The Directors submit that assessment for violations that occurred before the October 1985 Notice gave them no opportunity to cure their violations and limit their liability. They specifically object to imposition of civil money penalties for violation of Article I (requiring the filing of progress reports on compliance with the Consent Order every sixty days) because a bank examiner had allegedly led them to believe that they were in compliance with that article. The Directors claim that they believed Article I required a compliance report only after the first sixty days, but now acknowledge that they were not in compliance with Article I. Petitioners' Br. at 27. The Directors' contention that they were unfairly misled about Article I is meritless. As the Comptroller noted, "[t]he language of Article I plainly requires the filing of reports ... every sixty days." Comptroller's Decision at 15.

More generally, although it is true that the issuance of a notice of assessment formally started the procedure by which civil money penalties were imposed,[13] between the time the Directors agreed to the Consent Order and the issuance of the formal notice, the Directors were repeatedly notified that they were not complying with the Consent Order and that they faced the imposition of civil money penalties. The Comptroller did not lull the Directors into a false sense of security by encouraging them to believe that they were in full compliance with the Consent Order and then impose massive civil money penalties for past violations. On this record, we cannot conclude that the Comptroller acted arbitrarily.

██ The Directors also press an alleged inconsistency between the Comptroller's decision and a position adopted by counsel for the Comptroller at a pre-hearing conference. At that conference, counsel acknowl-

edged that the only charged violations were those included in the report of the January 31, 1985 examination. Petitioners' Br. at 43–44 (citing Tr. of Feb. 26, 1988 at 46). The Directors emphasize that the conference occurred *after* the January 27, 1988 amendment of the October 1985 Notice (which in turn incorporated the violations in the January 31, 1985 report). Although the focus of the Comptroller's final decision was the ten articles in the October 1985 Notice, the decision also reflected later violations of those same articles. *See* Comptroller's Decision at 18, 22.

██ The Comptroller reasoned that the January 27, 1988 amendment of the October 1985 Notice gave the Directors " 'a reasonable opportunity to know the claims of the opposing party and to meet them.' " *Id.* at 14 (quoting *Morgan v. United States*, 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1938)). As this court has noted, "[i]t is, of course, well settled that administrative pleadings are to be liberally construed and amended." *Brock v. Dow Chem. U.S.A.*, 801 F.2d 926, 930 (7th Cir. 1986); *see also L.G. Balfour Co. v. Federal Trade Comm'n*, 442 F.2d 1, 19 (7th Cir.1971) ("There is no requirement that a complaint in an administrative proceeding enumerate precisely every event to which a hearing examiner may finally attach significance. The purpose of the administrative complaint is to give the responding party notice of the charges against him."). Administrative pleadings not only may be amended prior to a hearing but also may be clarified during a hearing. *See Swift & Co. v. United States*, 393 F.2d 247, 252 (7th Cir.1968). Absent evidence that a party is misled by an administrative complaint, resulting in "prejudicial error," we shall not reverse. *L.G. Balfour*, 442 F.2d at 19.

We believe that any inconsistency in the position of the agency, as a result of the statement of counsel at the pre-hearing conference, produced no unfairness. At the hearing itself, the ALJ made clear that he was allowing the introduction of evidence of continuing violations:

---

**13.** *See* 12 U.S.C. § 1818(i)(2)(i).

I'll tell you one of the reasons I'm taking is if it's true that present tense violations are only the ones for which civil money penalties may be assessed, I would tend to believe that [the Comptroller] is going to argue that the bank is still violating. Tr. of Mar. 23, 1988 at 62. Thus, the Directors were aware that they potentially faced liability for post-notice violations of the ten articles originally specified in the October 1985 Notice. On this record, we cannot say that the Comptroller committed prejudicial error.

 Finally, the Directors contend that civil money penalties are unjustified in this case because the violations for which they were penalized " 'were not of sufficient gravity to endanger the safety of the bank.' " Petitioners' Br. at 32 (quoting ALJ Recommended Decision and Order at 128). However, earlier in the same sentence that the Directors quote, the ALJ did find that "the gravity of the violations were deviations from fully safe and sound banking practices." ALJ Recommended Decision and Order at 127. Moreover, in context, this finding related to one of the factors in 12 U.S.C. § 1818(i)(2)(ii), which concerned the appropriate amount of the penalty, not the propriety of assessing any penalty at all. The Comptroller determined that the gravity of the violations was more serious than had the ALJ. · *See* Comptroller's Decision at 67. The Directors have not established that the Comptroller's final assessment was unsupported by substantial evidence.

### CONCLUSION

Finally, although we hold that the Comptroller had the legal authority to impose civil money penalties for actions occurring between the issuance of the cease and desist order and notice of assessment, such authority, even under this now-superseded statutory scheme, was hardly without significant restraints. The statute required that the Comptroller tailor the penalty according to specific criteria. No penalty was assessed without a hearing, and, finally, the Comptroller's determination has been subject to review in this court. As the House committee report noted when these safeguards were first proposed, they should assure that the Comptroller and other agencies with analogous civil money penalty powers "are not arbitrary and capricious in their use of civil money penalties." H.R.Rep. No. 1383, 95th Cong., 2d Sess. 18 (1978), U.S.Code Cong. & Admin. News 1978, p. 9290.

For the foregoing reasons, the decision of the Comptroller is affirmed.

AFFIRMED.