KAREN LeCRAFT HENDERSON, Circuit Judge,
dissenting:
The majority opinion has taken a straightforward case of statutory construction and produced a result that would make Rube Goldberg tip his hat. Breaking the simple noun “research” into “temporal” bits, Maj. Op. at 391, 391, 396, narrowing the verb phrase “are destroyed” to an unintended scope, id. at 394, dismissing the definition section of implementing regulations promulgated by the Department of Health and Human Services (HHS) (in case the plain meaning of “research” were not plain enough), id. at 394 n. *, my colleagues perform linguistic jujitsu. I must therefore respectfully dissent.
The Government appeals from the district court’s entry of a preliminary injunction prohibiting it “from implementing, applying, or taking any action whatsoever pursuant to” the NIH Guidelines for Human Stem Cell Research (Guidelines), 32 Fed.Reg. 32,170 (July 7, 2009), “or otherwise funding research involving human embryonic stem cells as contemplated in the Guidelines.” Order, Sherley v. Sebelius, 704 F.Supp.2d 63 (D.D.C.2010) (No. 09-1575). “On a motion for a preliminary injunction, the district court must balance four factors: (1) the movant’s showing of a substantial likelihood of success on the merits, (2) irreparable harm to the movant, (3) substantial harm to the nonmovant, and (4) public interest.” Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291 (D.C.Cir.2009). We review the district court’s weighing of the preliminary injunction factors for abuse of discretion and its findings of fact under the clearly erroneous standard. Id. To the extent its decision turns on a question of law, our review is de novo. Id. I believe that the plaintiffs, researchers who use adult stem cells only, are likely to succeed on the merits of their challenge to the Guidelines and that the district court did not abuse its discretion in weighing the preliminary injunction factors *400 in favor of granting the injunction. Accordingly, I would affirm.
I. Likelihood of Success on the Merits
The majority opinion sets out the background information describing the “derivation” of human embryonic stem cells (hESCs) from a human embryo — which action destroys the embryo — and the subsequent use of the hESCs in the hope of remedying many serious, and often fatal, diseases and debilitating physical conditions. I take no exception to that portion of the majority opinion except to the extent that it recites the “historical record suggests the Congress passed the [Dickey-Wicker] Amendment chiefly” to address matters other than hESC research. Maj. Op. at 390. The Government’s brief suggests otherwise. After explaining that the Congress enacted the Amendment “in reaction to a 1994 NIH panel report,” Appellants’ Br. 21, it recites that the 1994 report advocated federal funding of research “designed to improve the process of in vitro fertilization, to determine whether embryos carried genetic abnormalities, and to isolate embryonic stem cells.” Id. (second emphasis added). There is no reason to assume, therefore, the Congress did not consider hESC research when it first enacted the Dickey-Wicker Amendment (Amendment) in 1996.
The Amendment, reenacted annually as a rider to appropriations legislation, prohibits the expenditure of federal funds both for “the creation of a human embryo or embryos for research purposes” and for “research in which a human embryo or embryos are destroyed.” Consolidated Appropriations Act of 2010, Pub.L. No. 111-117, § 509(a), 123 Stat. 3034, 3280-31 (Dec. 16, 2009). It is the latter ban that the plaintiffs claim is violated by the 2009 Guidelines. Determining whether hESC research is “research in which a human embryo or embryos are destroyed” requires determining the meaning of “research.” The plaintiffs contend that all hESC research constitutes research in which human embryos are destroyed and that the Amendment accordingly prohibits federal funding thereof. The Government counters that the derivation of hESCs and the subsequent use of those cells, although both research, are not part of the same— and prohibited — research. We construe the Amendment under the familiar two-step approach set forth in Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Chevron step one asks if the “Congress has directly spoken to the precise question at issue.” Id. at 842, 104 S.Ct. 2778. “We start with the plain meaning of the text, looking to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.” Blackman v. District of Columbia, 456 F.3d 167, 176 (D.C.Cir.2006) (internal quotation marks omitted). I believe we need go no further than Chevron step one here because the plain meaning of the Amendment is easily grasped. See id. (“If the [statute] has a plain and unambiguous meaning, our inquiry ends so long as the resulting statutory scheme is coherent and consistent.” (internal quotation marks omitted)). Accordingly, “that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.” Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778.
The district court correctly looked to the dictionary definition of “research” as “diligent and systematic inquiry or investigation into a subject in order to discover or revise facts, theories, applications, etc.” Sherley v. Sebelius, 704 F.Supp.2d at 70 (citing Random House Dictionary); see also Maj. Op. at 395 (quoting Oxford En *401 glish Dictionary Online (“Systematic investigation or inquiry aimed at contributing to knowledge of a theory, topic, etc., by careful consideration, observation, or study of a subject”)). Research, then, comprises a systematic inquiry or investigation. And “systematic” connotes sequenced action. XVII Oxford English Dictionary 498 (2d ed. 1989) (“systematic”: “Arranged or conducted according to a system, plan, or organized method ....”); see also CACI Int'l Inc. v. St. Paul Fire & Marine Ins. Co., 566 F.3d 150, 158-59 (4th Cir.2009) (describing “systematic” behavior as “a series of acts” (internal quotation marks omitted)). The first sequence of hESC research is the derivation of stem cells from the human embryo. The derivation of stem cells destroys the embryo and therefore cannot be federally funded, as the Government concedes. See Maj. Op. at 395-96. I believe the succeeding sequences of hESC research are likewise banned by the Amendment because, under the plain meaning of “research,” they continue the “systematic inquiry or investigation.”
That the intent of the 1996 Congress, in enacting the Amendment, is to prohibit all hESC research — not just research attendant on the derivation of the cells — is clear by comparing the language used to ban federal funding for the creation of an embryo with the language the plaintiffs rely on. See Erlenbaugh v. United States, 409 U.S. 239, 244, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972) (rule that statutes in pari materia should be construed together “is but a logical extension of the principle that individual sections of a single statute should be construed together”); Motion Picture Ass’n of Am. v. FCC, 309 F.3d 796, 801 (D.C.Cir.2002) (“Statutory provisions in pari materia normally are construed together to discern their meaning.”). While the Amendment prohibits federal financing of the “creation of a human embryo ... for research purposes,” it does not use parallel language in addressing the destruction of embryos. It bans federal funding of “research” rather than the “destruction of human embryos for research purposes.” Research, then, is the express target of the ban the Congress imposed with respect to the destruction of a human embryo. This makes perfect sense because in 1996, according to the record, hESC research had barely begun. Deisher Decl. ¶ 7. The Congress, recognizing its scant knowledge about the feasibility/scope of hESC research, chose broad language with the plain intent to make the ban as complete as possible. Because the meaning of research is plain, and the intent of the Congress to ban the federal funding of hESC research is equally plain, I would stop at Chevron step one and enjoin the Guidelines as violative of the Amendment to the extent they allow federal funds to be used for hESC research.
If there were any uncertainty about the extent of the Amendment’s ban, it would be erased by reading the Amendment’s language in full, as the district court— again, correctly — did. The ban on federal funding of hESC research provides that federal funds may not be used for:
[RJesearch in which a human embryo or embryos are destroyed, discarded, or knowingly subjected to risk of injury or death greater than that allowed for research on fetuses in útero under 45 C.F.R. 46.204(b) and section 498(b) of the Public Health Service Act (42 U.S.C. 289g(b)).
Pub.L. No. 111-117, § 509(a)(2), 123 Stat. at 3280-81. The Amendment’s incorporation of 45 C.F.R. § 46.204(b) — HHS’s own regulation — relates to “[rjesearch involving pregnant women and fetuses,” as section 46.204 is entitled. “Research,” as used in section 46.204(b), means “a systematic investigation, including research *402 development, testing and evaluation, designed to develop or contribute to generalizable knowledge.” 45 C.F.R. § 46.102(d) (emphasis added); see id. § 46.202 (“definitions- in § 46.102 [are] applicable to [§ 46.204]”). In expressly linking “research in which a human embryo or embryos are destroyed, discarded, or knowingly subjected to risk of injury or death” and “research on fetuses in útero under 45 C.F.R. 46.204(b),” the Congress unambiguously manifested its intent that “research” as used in the Amendment is to have the same meaning as “research” used in section 46.204(b).[1] Moreover, the “presumption that a given term is used to mean the same thing throughout a statute” is “at its most vigorous when a term is repeated within a given sentence,” as “research” is in the Amendment. Brown v. Gardner, 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994). Section 46.102(d) confirms that research involves sequenced action by defining it to include “development, testing and evaluation” sequences. “Research development” perfectly describes the first sequence of hESC research, that is, the derivation of the cells. The testing and evaluation sequences of hESC research cannot be performed without first conducting the research involved in deriving hESCs from the human embryo. The derivation of hESCs is, thus, the sine qua non developmental sequence on which all subsequent sequences of hESC research rest. Moreover, nothing in the record suggests that hESCs are derived for any purpose other than the testing and evaluation of those cells. That hESCs cannot be tested and evaluated unless and until they are derived from a human embryo, combined with the fact that derivation of hESCs is done solely as part of a “systematic investigation” of those cells, demonstrates that derivation is the necessary first sequence of hESC research. Because derivation of hESCs necessarily destroys a human embryo or embryos, and because derivation constitutes at least hESC research development under the Amendment, all hESC research is “research in which a human embryo or embryos are destroyed.” Accordingly, the plaintiffs’ challenge to the Amendment is likely to succeed because the Amendment prohibits the expenditure of federal funds to engage in hESC research in all of its sequences.
In my view, the majority opinion strains mightily to find the ambiguity the Government presses.[2] Treating “research” as composed of free-standing pieces, it concludes that the only piece that is banned is the derivation of the hESCs. The authority for this novel reading of “research” is not the dictionary but the Amendment’s use of the phrase “in which a human embryo or embryos are destroyed” rather than “for which a human embryo or embryos were destroyed.” Maj. Op. at 394 (emphases added).[3] The majority opinion *403 correctly notes that the Dictionary Act, which provides that “unless the context indicates otherwise ... words used in the present tense include the future as well as the present,” 1 U.S.C. § 1, implies “that the present tense generally does not include the past,” Carr v. United States, — U.S. —, 130 S.Ct. 2229, 2236, 176 L.Ed.2d 1152 (2010). That is not true, however, where, as here, “the context indicates otherwise.” 1 U.S.C. § 1. See Lindh v. Murphy, 521 U.S. 320, 331, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (“one has to strain to find ... ambiguity” in reading statutory provision that “is applicable if a State establishes ... a mechanism” to include State that established mechanism before statute’s enactment (first emphasis added)); Abercrombie v. Clarke, 920 F.2d 1351, 1359 (7th Cir.1990) (finding “abundantly clear that Congress intended the present tense language [in provisions of Financial Institutions Reform, Recovery, and Enforcement Act of 1989 providing for civil monetary penalties] to apply to past acts”), cert. denied, 502 U.S. 809, 112 S.Ct. 52, 116 L.Ed.2d 29 (1991); Bell v. Maryland, 378 U.S. 226, 236, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964) (“very possible]” that Maryland Court of Appeals would hold “the use of the present tense instead of the more usual future tense” in Maryland statute “to apply to past as well as future conduct”); Coal. for Clean Air v. S. Cal. Edison Co., 971 F.2d 219, 225 (9th Cir. 1992) (“The present tense is commonly used to refer to past, present, and future all at the same time. We believe that Congress used the present tense word ... because it did not wish to limit [the statute’s] reach to either past or future disapprovals.”); United States v. Reilly Tar & Chem. Corp., 546 F.Supp. 1100, 1108-09 (D.Minn.1982) (provision allowing United States to seek injunction against any person “contributing to” handling, storage, treatment, transportation or disposal of solid or hazardous waste could be applied, at motion to dismiss stage, to past owner of inactive site who was no longer “contributing to the condition”); cf. Carr, 130 S.Ct. at 2244-45 (Alito, J., dissenting) (responding to majority’s reliance on statute’s use of present tense to reject statute’s reach to past tense by noting that “modern legislative drafting manuals,” including those used by both the United States Senate and House, “teach that, except in unusual circumstances, all laws ... should be written in the present tense”); Nickell v. Beau View of Biloxi, LLC, No. 10-60204, 636 F.3d 752, 756-57 (5th Cir.2011) (notwithstanding general rule, context indicated otherwise where inclusion of future events would conflict with statute of limitations and other time-limited rights conferred by statute); see also Guidiville Band of Pomo Indians v. NGV Gaming, Ltd., 531 F.3d 767, 776 (9th Cir.2008) (“[0]n its own terms the Dictionary Act ... looks first to ‘context,’ and only if the ‘context’ leaves the meaning open to interpretation does the default provision come into play.”). There is no question that, here, context manifests that the present tense includes both the past as well as the future.[4] As *404 already discussed, the derivation of hESCs constitutes at least research development, which, in context, means that it is “research in which a human embryo or embryos are [at any point] destroyed.”
But it is not only the majority opinion’s view of verb tenses that is wrong. My colleagues rest their Chevron step two analysis on the transformation of “research” into “research project” in the Amendment’s text. In other words, it reads “research” as if it were synonymous with “research project.” Maj. Op. at 389-91, 393-97, 398-99. But “research” is the overall “systematic investigation or inquiry” in a field — here, hESCs — of which each project is simply a part. Webster’s Third New International Dictionary 1813 (1993) (“project” means “a definitely formulated piece of research” (emphasis added)). Without the majority opinion’s misreading of “research” as “research project,” the entire notion of pieces of research evaporates — taking with it the “ambiguity” that sets Chevron step two in motion.[5]
Finally, it is of little moment that the Congress has reenacted the Amendment unchanged every year since 1996. While congressional reenactment ordinarily means the Congress intended to adopt an existing agency interpretation of the statute, e.g., Commodity Futures Trading Comm’n v. Schor, 478 U.S. 833, 846, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), “[tjhere is an obvious trump to the reenactment argument ... in the rule that ‘[w]here the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction,’ ” Brown v. Gardner, 513 U.S. 115, 121, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) (quoting Demarest v. Manspeaker, 498 U.S. 184, 190, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991)). Moreover, “congressional silence lacks persuasive significance, particularly where administrative regulations are inconsistent with the controlling statute,” id. (internal quotation marks and citations omitted), and “[a] regulation’s age is no antidote to clear inconsistency with a statute,” id. at 122, 115 S.Ct. 552.[6] Because I believe the Government’s reading of the Amendment contravenes the Amendment’s plain meaning, I am unpersuaded that the Congress, by simply reenacting the Amendment, has sanctioned that reading.[7] Accordingly, the *405 plaintiffs have demonstrated to me a strong likelihood that they will prevail on the merits.
II. Remaining Factors
In addition to likelihood of success on the merits, the plaintiffs must also show “(2) irreparable harm to [them], (3) [no] substantial harm to the [Government], and (4) [the] public interest [is not harmed],” Davis, 571 F.3d at 1291, in order to obtain injunctive relief.
To demonstrate irreparable harm in the absence of an injunction, the plaintiffs’ injury “[must be] of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.” Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C.Cir.2006) (internal quotation marks omitted). We earlier held that these two plaintiffs do indeed suffer “an actual, here-and-now injury” from the Guidelines and that the probability they will “lose funding to projects involving [h]ESCs” is “substantial enough ... to deem the injury to them imminent.” Sherley v. Sebelius, 610 F.3d 69, 74 (D.C.Cir.2010) (emphasis added). As the district court noted, moreover, their injury is irreparable because we “cannot compensate [them] for their lost opportunity to receive funds.” Sherley, 704 F.Supp.2d at 72. The majority opinion now dismisses their injury as “necessarily uncertain.” Maj. Op. at 398. At the same time, my colleagues see no uncertainty in the harm to the Government if the injunction is affirmed. Id. I agree that enjoining the Guidelines would disrupt any hESC research projects that have already received federal funding and therefore harm the Government. Finally, I believe the district court correctly determined that enjoining the Guidelines would further the public interest. See Sherley, 704 F.Supp.2d at 73 (“ ‘It is in the public interest for courts to carry out the will of Congress and for an agency to implement properly the statute it administers.’ ” (quoting Mylan Pharms., Inc. v. Shalala, 81 F.Supp.2d 30, 45 (D.D.C.2000))). As *406 discussed supra, I believe the plaintiffs have made a strong showing of likelihood of success on the merits. Under the sliding scale approach that remains the law of our Circuit, see Maj. Op. at 392-93, “[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor.” Davis, 571 F.3d at 1291-92. Having concluded the plaintiffs have indeed made “an unusually strong showing” on the first factor, I cannot say the district court abused its discretion in balancing all of the factors in favor of granting preliminary injunctive relief.
For the foregoing reasons, I respectfully dissent.

. That the Amendment references section 46.204(b) in comparing the risk of injury or death to a human embryo does not affect the Amendment's incorporation of section 46.102(d)'s definition of research. Determining the level of risk permitted for “research on fetuses in útero under [section] 46.204(b)” necessarily requires construing “research” and section 46.102(d) defines "research.”

. The Government may not have always taken this view of the Amendment. See Letter from Kate Berg, Deputy Scientific Director, NCHGR, to Wendy Fibison, Researcher at Georgetown University Medical Center (Oct. 10, 1996) (Joint Appendix 283) ("NIH position on embryo research” is federally funded researchers "[can]not engage in embryo related research” including certain types of "analysis from DNA derived from a human embryo”). But see Appellants' Reply Br. 7-8 (claiming Georgetown research, like derivation, “require[d] the removal of a cell from an embryo”).

. The Government's suggested change in inflection can fairly be described as Clintonesque (“It depends upon what the meaning of *403 the word 'is' is.” H.R.Rep. No. 105-830, at 40 (Dec. 16, 1998) (quoting Grand Jury Testimony of President W.J. Clinton, Jones v. Clinton, 36 F.Supp.2d 1118 (E.D.Ark.1999), at 57-58 (Aug. 17, 1998))).

. Moreover, the Amendment combines the present tense "are” with the past participle “destroyed,” that is, with "[a] verb form indicating past or completed action or time that is used as a verbal adjective.” Fla. Dep’t of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 39, 128 S.Ct. 2326, 171 L.Ed.2d 203 (2008) (alteration in original) (quoting American Heritage Dictionary 1287 (4th ed. 2000)). Other statutes similarly use the present tense, especially a combination of "is” with a past participle, to signify conduct that has already occurred. See, e.g., 10 U.S.C. § 6253 (Secre *404 tary of Navy "may replace ... any medal of honor, Navy cross[ etc.] awarded under this chapter that is stolen, lost, or destroyed or becomes unfit for use" (emphases added), that is, a medal which has been stolen, lost, or destroyed or become unfit for use before replacement).

. Likewise, the sequenced action inherent in “research," supra pp. 400-01, does not equate to individual research "projects."

. Moreover, the challenged Guidelines were not promulgated until 2009 so that congressional reenactment of the Amendment in the years predating 2009 signifies nothing in relation to the Guidelines.

. The majority opinion dismisses the plaintiffs' challenge that the Guidelines permit a researcher to use federal funds to purchase hESCs and even permit a federally-funded researcher to derive the cells himself. Maj. Op. at 397-98. It concludes those possibilities do not affect the facial validity of the Guidelines because they do not demonstrate that "no set of circumstances exists under which the [Guidelines] would be valid.” United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Whether Salerno's "no set of circumstances” approach is properly applied in the absence of a constitutional challenge is not altogether settled in our Circuit. We have held "that the Salerno standard does not apply” when assessing "the validity of a regulation challenged as facially incompatible with governing statutory law.” Nat’l Mining Ass'n v. U.S. Army Corps of Eng’rs, 145 F.3d 1399, 1407 (D.C.Cir.1998). In National Mining we "confirm[ed] that the normal Chevron test” applies and "is not transformed into an even more *405 lenient 'no valid applications' test just because the attack is facial.” Id..; accord Becker v. FCC, 95 F.3d 75, 78 (D.C.Cir. 1996). Subsequently, however, we noted that National Mining "apparently overlooked Reno v. Flores, 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).” Amfac Resorts, LLC v. Dep’t of the Interior, 282 F.3d 818, 826 (D.C.Cir.2002), judgment vacated on other ground sub nom. Nat’l Park Hospitality Ass’n v. Dep’t of Interior, 538 U.S. 803, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003). In Reno the Supreme Court seemed to apply Salerno’s "no set of circumstances” test to an ultra vires challenge to a regulation. 507 U.S. at 300-01, 113 S.Ct. 1439. But see id. at 309-15, 113 S.Ct. 1439 (challenge to regulation does not succeed "if the regulation has a reasonable foundation, that is, if it rationally pursues a purpose that it is lawful for the [agency] to seek” (internal quotation marks and citation omitted)). As Amfac discusses, it is not clear whether the Salerno test applies to a purely statutory challenge or whether the standard set forth in INS v. National Center for Immigrants’ Rights, Inc., 502 U.S. 183, 188, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991) — under which a regulation can be invalid even if it has some valid applicability — applies. Amfac, 282 F.3d at 827. Amfac acknowledges that it is of course bound by the decision of an earlier panel unless, inter alia, "an intervening Supreme Court decision alters the law of the circuit.” 282 F.3d at 827. Reno, however, predates National Mining. Amfac does not resolve whether, "despite Reno v. Flores, National Mining ... must stand as circuit law unless and until the full court overrules it.” 282 F.3d at 827. Cf. Air Transp. Ass’n of Am. v. U.S. Dep’t of Transp., 613 F.3d 206, 213 (D.C.Cir.2010) (applying Reno to facial challenge of regulation without discussing Amfac or National Mining); Bldg. & Constr. Trades Dep’t, AFL-CIO v. Allbaugh, 295 F.3d 28, 33 (D.C.Cir.2002) (possibility agency could improperly apply executive order does not establish facial invalidity thereof). See generally Stuart Buck, Salerno vs. Chevron: What to do About Statutory Challenges, 55 Admin. L.Rev. 427 (2003).