AMFAC RESORTS, L.L.C., Appellant,

v.

UNITED STATES DEPARTMENT OF
THE INTERIOR, et al., Appellees.

Nos. 01–5223, 01–5226, 01–
5229 and 01–5233.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 6, 2001.

Decided March 1, 2002.

Kenneth S. Geller argued the cause for appellants. With him on the briefs were David M. Gossett, Mark H. Lynch, Robert A. Long Jr., Daniel F. Attridge, Robert R. Gasaway, Ashley C. Parrish, Edward J. Shapiro and Eric J. Wycoff.

Marina Utgoff Braswell, Assistant U.S. Attorney, argued the cause for appellees. With her on the brief were Roscoe C. Howard Jr., U.S. Attorney, R. Craig Lawrence, Assistant U.S. Attorney, and Michael A. Carvin.

Before: RANDOLPH and GARLAND, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

These are four consolidated cases on appeal from the judgment of the district court sustaining regulations of the National Park Service governing concession contracts in the National Park System. Many of the issues are tied to the history of the National Park System and the functions concessioners perform in the operation of the parks.

The history begins with the discovery of "Old Faithful" and the other natural wonders of what is now Yellowstone National Park. In 1872, Congress withdrew the land at the headwaters of the Yellowstone River from "settlement, occupancy, or sale," thus creating the first national park in the United States. Act of Mar. 1, 1872,

ch. 24, § 1, 17 Stat. 32. *See also* AUBREY L. HAINES, YELLOWSTONE NATIONAL PARK: ITS EXPLORATION AND ESTABLISHMENT (1974). Not everyone had been enthusiastic about the plan to create Yellowstone National Park. A local newspaper editorial worried that "the effect of this measure will be to keep the country a wilderness, and shut out, for many years, the travel that would seek that curious region if good roads were opened through it and hotels built therein." HAINES, *supra*, at 127 (quoting the HELENA DAILY HERALD of Mar. 1, 1872). In the final legislation, Congress responded by authorizing the Secretary of the Interior to lease portions of the park for "the erection of buildings for the accommodation of visitors." 17 Stat. 33.

As the United States withdrew more areas from the public domain, it continued to favor the interests of park visitors. In creating the National Park Service in 1916, Congress authorized the Interior Secretary to "grant privileges, leases, and permits for the use of land for the accommodation of visitors" to each of the "various parks, monuments, or other reservations" under the Secretary's authority. An Act to Establish a National Park Service, ch. 408, 39 Stat. 595 (1916). In the view of the first director of the Park Service, Stephen Mather: "Scenery is a hollow enjoyment to a tourist who sets out in the morning after an indigestible breakfast and a fitful sleep in an impossible bed." Dennis J. Herman, *Loving Them to Death: Legal Controls on the Type and Scale of Development in the National Parks*, 11 STAN. ENVTL. L.J. 3, 3 (1992).

During its first thirty years, the Park Service followed internal regulations and policies governing concessioners and their obligations to park visitors and to the national park lands. The government also offered financial inducements to private contractors to convince them to provide and operate facilities in what were often remote locations. *See Park Concession Policy: Hearings Before the Subcomm. on National Parks of the House Comm. on Interior and Insular Affairs*, 88th Cong. 5–8 (1964) [hereinafter *Park Concession Policy Hearings*] (letter from John A. Carver, Jr., Assistant Secretary of the Interior).

For our purposes the most significant of these incentives was a preferential right of renewal, which "contemplated that every existing contract covering public operations [in the national parks] will be renewed at the expiration thereof, provided, of course, that full and satisfactory service to the public had been given thereunder." Memorandum for the Acting Under Secretary, U.S. Department of the Interior (Aug. 10, 1940). When the Interior Department sought to change its policies and withdraw some of these financial incentives in the late 1940s, the concessioners and some in Congress balked. *See* H.R. Res. 66, 81st Cong. (1950), passed by the Comm. on Public Lands and included in H.R.REP. No. 81–3133, at 5–6 (1950). In response, the Secretary announced new guidelines for concession contracts and preserved many of the existing financial incentives for concessioners, including the preferential right of renewal. *Id.* at 4–5. The House Committee on Public Lands passed a resolution endorsing these new guidelines, although the resolution of course had no legal effect. *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

By the 1960s, other House committees started expressing doubt about the soundness of the Interior Department's contracting policies, particularly the financial incentives it was giving concessioners. *See* HOUSE COMM. ON GOVERNMENT OPERATIONS, SURVEY OF SELECTED ACTIVITIES, H.R.REP. No. 88–306, pt. 3, at 4–12 (1963) ("The committee's inquiry disclosed considerable

weakness in the National Park Service's operations in several matters involving concessioners in the national parks."). When Congress considered the 1964 appropriations bill for the Department of the Interior, the House Committee on Appropriations recommended that "competitive bidding should be required for concession contracts, in lieu of the current practice of granting preferential opportunities to existing concessioners to negotiate new contracts." DEPARTMENT OF THE INTERIOR AND RELATED AGENCIES APPROPRIATION BILL, H.R.REP. No. 88–177, at 10 (1963).

Concerned that "certain other committees that do not have jurisdiction" had "attempted to get into the problem of concessions," the House Committee on Interior and Insular Affairs produced a bill to "put into statutory form" the longstanding concessions policies of the Park Service, including the preferential right of renewal. H.R.REP. No. 89–591, at 1 (1965); *Park Concession Policy Hearings* at 19. In 1965, these concession policies were enacted into law. *See* 111 CONG. REC. 23,632–48 (1965). Part of the legislation provided that the "Secretary [of the Interior] shall ... giv[e] preference in the renewal of contracts or permits and in the negotiation of new contracts or permits to the concessioners who have performed their obligations ... to the satisfaction of the Secretary." National Park Service Concessions Policy Act, Pub.L. No. 89–249, § 5, 79 Stat. 969, 970 (1965), *repealed by* National Parks Omnibus Management Act of 1998, Pub.L. No. 105–391, § 415(a), 112 Stat. 3497, 3515. The preference gave "incumbent concessioners, upon renewal, the right to meet any better offer received" by the Park Service. U.S. DEP'T OF THE INTERIOR, REPORT OF THE TASK FORCE ON NATIONAL PARK SERVICE CONCESSIONS 10 (1990).

The 1965 Act governed all concession contracts entered into by the Park Service. Concessioners paid the government a franchise fee, typically less than five percent of gross revenues, for the privilege of operating on federal land. If they used government-owned facilities they paid an additional fee.

In 1998, after several aborted attempts, Congress repealed the preferential right of renewal and enacted other rules governing concession contracts. National Parks Omnibus Management Act of 1998, 16 U.S.C. §§ 5951–5966.

Plaintiffs are three companies who have current concessions contracts with the Park Service and an association of concessioners. They brought four separate actions challenging the Park Service regulations, issued in 2000, to implement the 1998 Act. 65 Fed.Reg. 20,630 (Apr. 17, 2000) (to be codified at 36 C.F.R. pt. 51). The district court consolidated the four lawsuits, and granted summary judgment to the government on all of the claims save one (which has not been appealed to this court). *Amfac Resorts v. United States Dep't of the Interior*, 142 F.Supp.2d 54 (2001).

I.

The first issue centers on the 1998 Act's repeal of the statutory preferential right of renewal in § 5 of the 1965 Act. The 1998 Act provided that, except for small contracts and outfitter and guide services, "the Secretary shall not grant a concessioner a preferential right to renew a concessions contract." 16 U.S.C. § 5952(7). A savings clause in the 1998 Act, § 415(a), states: "repeal of [the 1965 Act] shall not affect the validity of any concessions contract or permit entered into under such Act, but the provisions of this title shall apply to any such contract or permit except to the extent such provisions are inconsistent with the terms and conditions of any such contract or permit." Pub.L. No.

105–391, § 415(a), 112 Stat. 3497, 3515 (1998).

The Park Service interpreted the repealing and the savings clauses in the following narrative regulation:

### § 51.102 What is the effect of the 1998 Act's repeal of the 1965 Act's preference in renewal?

(a) Section 5 of the 1965 Act required the Secretary to give existing satisfactory concessioners a preference in the renewal (termed a "renewal preference" in the rest of this section) of its concession contract or permit. Section 415 of the 1998 Act repealed this statutory renewal preference as of November 13, 1998. It is the final decision of the Director, subject to the right of appeal set forth in paragraph (b) of this section, that holders of 1965 Act concession contracts are not entitled to be given a renewal preference with respect to such contracts (although they may otherwise qualify for a right of preference regarding such contracts under Sections 403(7) and (8) of the 1998 Act as implemented in this part). However, if a concessioner holds an existing 1965 Act concession contract and the contract makes express reference to a renewal preference, the concessioner may appeal to the Director for recognition of a renewal preference.

(b) Such appeal must be in writing and be received by the Director no later than thirty days after the issuance of a prospectus for a concession contract under this part for which the concessioner asserts a renewal preference. The Director must make a decision on the appeal prior to the proposal submission date specified in the prospectus. Where applicable, the Director will give notice of this appeal to all potential offerors that requested a prospectus. The Director may delegate consideration of such appeals only to a Deputy or Associate Director. The deciding official must prepare a written decision on the appeal, taking into account the content of the appeal and other available information.

(c) If the appeal results in a determination by the Director that the 1965 Act concession contract in question makes express reference to a renewal preference under section 5 of the 1965 Act, the 1998 Act's repeal of section 5 of the 1965 Act was inconsistent with the terms and conditions of the concession contract, and that the holder of the concession contract in these circumstances is entitled to a renewal preference by operation of law, the Director will permit the concessioner to exercise a renewal preference for the contract subject to and in accordance with the otherwise applicable right of preference terms and conditions of this part, including, without limitation, the requirement for submission of a responsive proposal pursuant to the terms of an applicable prospectus. The Director, similarly, will permit any holder of a 1965 Act concession contract that a court of competent jurisdiction determines in a final order is entitled to a renewal preference, for any reason, to exercise a right of preference in accordance with the otherwise applicable requirements of this part, including, without limitation, the requirement for submission of a responsive proposal pursuant to the terms of an applicable prospectus.

36 C.F.R. § 51.102 (2001).

The Park Service thus will not recognize a preferential right of renewal for concessioners whose pre–1998 contracts are expiring, unless the contract expressly so provides. *See* 65 Fed.Reg. at 20,631–33. In the language of the savings clause of § 415(a), without such contractual "terms and conditions" it would not be "inconsistent"—as the Park Service sees it—to re-

fuse to allow a preferential right of renewal.

A typical concession contract runs for 15 or 20 years. REPORT OF THE TASK FORCE ON NATIONAL PARK SERVICE CONCESSIONS, *supra,* at 5. One of the plaintiffs, Amfac Resorts, L.L.C., had a 30–year contract for the Grand Canyon. A right of renewal for pre–1998 contracts is therefore a matter of great interest to those holding these contracts. The concessioners say that the renewal provision of the 1965 Act represented an "entrenched policy"; that the policy was incorporated by law as an unwritten term in every concession contract signed between 1965 and 1998; and that the Park Service regulation violates § 415 of the 1998 Act (the savings clause) because it allows a preferential right of renewal only if contracts before the 1998 Act expressly so state.

### A.

The concessioners' argument in favor of an "implied" right of renewal initially rests on the *"Christian* doctrine," named after *G.L. Christian & Assocs. v. United States,* 160 Ct.Cl. 1, 312 F.2d 418, 424 (Ct.Cl. 1963). As they explain it, the doctrine requires "that longstanding and deeply-ingrained agency policies, such as the [Park Service's] entrenched policy of granting concessioners renewal rights in exchange for concessioner investments, form a mandatory part of all government contracts." Brief for Appellants at 21.

The Federal Circuit has, on occasion, concluded that certain statutory or regulatory provisions may become part of a government contract even though the contract does not contain language to that effect. *See S.J. Amoroso Constr. Co. v. United States,* 12 F.3d 1072, 1075 (Fed.Cir.1993); *General Engineering & Machine Works v. O'Keefe,* 991 F.2d 775, 779 (Fed.Cir.1993).

 Our court has never adopted the Federal Circuit's *Christian* doctrine.

Even if we did so, it would boot the concessioners nothing. In describing the doctrine, they have omitted a crucial element. The Federal Circuit does not hold that significant or important federal policies "form part of government contracts even where absent from those contracts' explicit text." Brief for Appellants at 22. If that were the law, Congressional power to make adjustments in legislation would be greatly constricted. Statutory provisions would live on as part of long-term contracts well after their repeal or modification. This is why, as the Supreme Court put it in *Dodge v. Board of Education,* 302 U.S. 74, 79, 58 S.Ct. 98, 82 L.Ed. 57 (1937), there is a "presumption" that "a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." To this the Court added in *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.,* 470 U.S. 451, 465–66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) [hereinafter *Atchison*]: "Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body." It is true, as the concessioners point out, that the holding of *Atchison* was that a statute did not itself create a contract. Reply Brief for Appellants at 12. But it is not true that the case is therefore "irrelevant." *Id.* The Court's reasoning applies equally to claims, such as the concessioners', that a statute (here the 1965 Act) created a contractual obligation in all contracts executed before its repeal. *See General Motors Corp. v. Romein,* 503 U.S. 181, 190, 112 S.Ct. 1105, 1111, 117 L.Ed.2d 328 (1992).

One element of the *Christian* doctrine, the element missing from the concessioners' statement of the law, saves it

from contradicting this line of Supreme Court authority. According to the Federal Circuit, it is not enough that the legislative or regulatory provision is important or significant (assuming one could make such rankings). To constitute a contractual obligation even though not written in the contract, the provision must be a mandatory contract clause, a clause the legislation—or as in *Christian*, 312 F.2d at 424, the regulation—requires to be included in contracts. Thus, "a mandatory contract clause that expresses a significant or deeply ingrained strand of public procurement policy is considered to be included in a contract by operation of law." *S.J. Amoroso Constr. Co. v. United States*, 12 F.3d at 1075. And the *Christian* doctrine "applies to mandatory contract clauses which express a significant or deeply ingrained strand of public procurement policy." *General Engineering & Machine Works v. O'Keefe*, 991 F.2d at 779.

■ The renewal provision contained in § 5 of the 1965 Act was by no stretch a mandatory contract term. The Secretary's contracting authority was derived from a different part of the 1965 Act—§ 3, which authorized the Secretary to "include in contracts" such "terms and conditions as, in his judgment, are required to assure the concessioner of adequate protection against loss of investment ... resulting from discretionary acts, policies, or decisions of the Secretary occurring after the contract has become effective...." § 3, 79 Stat. 969. Section 5 of the 1965 Act was of another sort. It stated that the Secretary "shall ... giv[e] preference in the renewal of contracts or permits...." § 5, 79 Stat. 970. Rather than leaving the matter to individual negotiations, § 5 required the Secretary to grant a right of renewal to all concessioners, regardless of the terms of their individual concession contracts. The provision thus constituted "legislation which merely declares a state policy, and directs a subordinate body to carry it into effect." *Dodge v. Bd. of Educ.*, 302 U.S. at 78, 58 S.Ct. at 99. We agree with the district court that if § 5 meant that the Secretary had to insert a preferential right of renewal clause in all concession contracts, one would have expected a direction, or at least an authorization, to this effect. 142 F.Supp.2d at 72. There is none.

It is possible that some parties nevertheless insisted on having a right of renewal written into their contracts and that the Secretary yielded. Possible, but not likely. The concessioners have identified no such contract and the Park Service is aware of none. 65 Fed.Reg. at 20,664. The Service's standard-form concession contract, in effect from 1965 to 1998, contained no right-of-renewal clause. *See* 65 Fed.Reg. at 20,632. The regulation under the 1998 Act nevertheless allows for the possibility and, in compliance with the saving clause, states that if a concession contract contains an express right of renewal the Secretary will honor it. 36 C.F.R. § 51.102(c) (2000).

## B.

■ Apart from the *Christian* doctrine, each of the concessioners maintains that the Park Service's regulation is "facially invalid because [it denies] altogether the *possibility* of implied contractual rights in individual cases" and prevents "any concessioner in a future proceeding from offering specific evidence of a bargained-for and mutually-agreed upon contractual renewal right. If even one concessioner has such evidence, the regulations denying those rights across-the-board are unlawful." Brief for Appellants at 26, 27. In other words, although the regulation is valid as applied to dozens of concession contracts, it is invalid because of the possibility that one concessioner might have an implied—that is, an unwritten—preferen-

tial right of renewal. The argument, aimed at the validity of the regulation on its face, does not accurately state the law.

In *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987), the Supreme Court stated:

> A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that the [statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an "overbreadth" doctrine outside the limited context of the First Amendment.

Justice Stevens believes that only the second sentence of the *Salerno* excerpt states the governing principle for facial challenges. He and Justice Scalia have debated whether the first sentence from *Salerno*—what has become known as the "no-set-of-circumstances" test—is instead controlling. *See City of Chicago v. Morales,* 527 U.S. 41, 55, 119 S.Ct. 1849, 1858, 144 L.Ed.2d 67 (1999) (plurality opinion by Stevens, J., joined by Justices Souter and Ginsburg); *id.* at 74–83, 119 S.Ct. at 1867–71 (Scalia, J., dissenting). *See also Anderson v. Edwards,* 514 U.S. 143, 155 n. 6, 115 S.Ct. 1291, 131 L.Ed.2d 178 (1995); *Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 318, 120 S.Ct. 2266, 2283, 147 L.Ed.2d 295 (2000) (Rehnquist, C.J., joined by Justices Scalia and Thomas, dissenting). For our part, we have invoked *Salerno's* no-set-of-circumstances test to reject facial constitutional challenges. *See, e.g., James Madison Ltd., by Hecht v. Ludwig,* 82 F.3d 1085, 1101 (D.C.Cir.1996); *Chemical Waste Mgmt., Inc. v. EPA,* 56 F.3d 1434, 1437 (D.C.Cir.1995); *Steffan v. Perry,* 41 F.3d 677, 693 (D.C.Cir.1994) (en banc).

The facial attack on § 51.102 is not, of course, on the basis that the regulation is unconstitutional. The claim is that § 51.102 conflicts with § 415 of the 1998 Act. In *National Mining Ass'n v. Army Corps of Engineers,* 145 F.3d 1399, 1407 (D.C.Cir.1998), we declined to adopt the *Salerno* test in a comparable case, stating that the "Supreme Court has never adopted a 'no set of circumstances' test to assess the validity of a regulation challenged as facially incompatible with governing statutory law."

Our examination of Supreme Court precedent in *National Mining* apparently overlooked *Reno v. Flores,* 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). There a class of alien juveniles, arrested on suspicion of being deportable and then detained pending deportation hearings, claimed that a regulation preventing their release except to close relatives violated the Due Process Clause and conflicted with the underlying statute. The Court, speaking through Justice Scalia, described the case as involving only a facial challenge to the regulation and then held as follows: "To prevail in such a facial challenge, respondents 'must establish that no set of circumstances exists under which the [regulation] would be valid.' *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). That is true as to both the constitutional challenges, see *Schall v. Martin,* 467 U.S. 253, 268, n. 18, 104 S.Ct. 2403, 2411, n. 18, 81 L.Ed.2d 207 (1984), and the statutory challenge, see [*INS v. National Center for Immigrants' Rights,* 502 U.S. 183, 188, 112 S.Ct. 551, 555, 116 L.Ed.2d 546 (1991) [hereinafter *NCIR*]]." 507 U.S. at 301, 113 S.Ct. at 1446. *See Public Lands Council v. Babbitt,* 167 F.3d 1287, 1301 (10th Cir.1999) (applying the *Reno v. Flores* formulation to a statutory challenge to a regulation). *Cf. Pharmaceutical Research & Mfrs. v. Concannon,* 249 F.3d 66, 77 (1st Cir.2001) (applying *Salerno* in a preemption case). *See also* Marc E. Isserles, *Overcoming*

*Overbreadth: Facial Challenges and the Valid Rule Requirement*, 48 Am. U. L.Rev. 359, 405 (1998).

■ When an intervening Supreme Court decision alters the law of the circuit, a panel of our court must follow the Court's decision in all later cases. *See, e.g., McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 350 (D.C.Cir.1995); *National Treasury Employees Union v. FLRA*, 30 F.3d 1510, 1516 (D.C.Cir.1994). But here the Supreme Court decision was not intervening; it was rendered before *National Mining*. Whether despite *Reno v. Flores, National Mining* therefore must stand as circuit law unless and until the full court overrules it is a question unnecessary for us to answer. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C.Cir.1996) (en banc). *National Mining* dealt only with the no-set-of-circumstances formulation of *Salerno*. It did not mention *NCIR*, the opinion cited in *Reno v. Flores* for the proposition that *Salerno* applied to statutory challenges. Justice Stevens, writing for the Court in *NCIR*, held: "That the regulation may be invalid as applied in some cases, however, does not mean that the regulation is facially invalid because it is without statutory authority." 502 U.S. at 188, 112 S.Ct. at 555. *NCIR*, without citing *Salerno*, echoed in a non-constitutional setting the sentence in *Salerno* following the no-set-of-circumstances test—"The fact that the [statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid," 481 U.S. at 745, 107 S.Ct. at 2100. *See Janklow v. Planned Parenthood*, 517 U.S. 1174, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (memorandum of Stevens, J., on denial of certiorari).

Either formulation—the no-set-of-circumstances test adopted from *Salerno* in *Reno v. Flores*, or the less strict *NCIR* standard—may pose potential problems for judicial review of agency regulations, especially in this circuit. Lacking a rulemaking record containing evidence relating to the rule's application to a particular entity, petitioners ordinarily mount only facial attacks, often on the ground that the agency's product conflicts with the statute. In such cases, the consequence of upholding the regulation because it is not invalid in all its applications (*Reno v. Flores*), or because it is invalid in only some of its applications (*NCIR*), may be that petitioners would have to make their challenge in another circuit and in another setting, in defense of an enforcement action for instance. Some of the statutes governing jurisdiction prescribe a specific time period for judicial review of regulations, restrict venue to our circuit, and may prohibit review outside the time period, except in limited circumstances. *See, e.g.,* Clean Air Act, 42 U.S.C. § 7607(b); Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9613(a); *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978); *United States v. Ethyl Corp.*, 761 F.2d 1153 (5th Cir.1985); Frederick Davis, *Judicial Review of Rulemaking: New Patterns and New Problems*, 1981 Duke L.J. 279, 285–90. Although one court has held that the Clean Air Act, 42 U.S.C. § 7607(b), deprived it of jurisdiction to review EPA regulations when they are applied, *see Potomac Elec. Power Co. v. EPA*, 650 F.2d 509, 513 (4th Cir.1981), we have ruled that preclusion must be explicit for review to be barred in an enforcement action, *see Indep. Cmty. Bankers of Am. v. Bd. of Governors of Fed. Reserve Sys.*, 195 F.3d 28, 34 (D.C.Cir.1999), and that even express preclusion may not operate when the issue would have been unripe during the period of statutory review. *See Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1204 (D.C.Cir.1998). Perhaps the congressional intent reflected in judicial review

provisions such as § 7607(b) of the Clean Air Act may also demand adjustments in the *Reno v. Flores* or *NCIR* test for reviewing facial attacks on regulations, assuming the tests are not constitutionally compelled. *See City of Chicago v. Morales*, 527 U.S. at 77, 119 S.Ct. at 1868 (Scalia, J., dissenting).

Whatever the outcome in such cases, the situation here is not comparable. Our circuit does not have exclusive jurisdiction over Park Service regulations, and judicial review is not confined to a particular time period. Nothing would preclude a concessioner from bringing an action for a declaratory judgment that the regulation, as applied to the concessioner, deprives it of a contractual right in violation of the savings clause. In fact, one of the consolidated actions in the district court was such a suit. Amfac's complaint alleged that its 1969 contract for the Grand Canyon was about to expire, that the contract contained an implied preferential right of renewal arising "from the circumstances of the formation of the 1969 contract," that the Park Service's regulation denied the existence of such an implied term, and that the regulation as applied to Amfac therefore violated § 415 of the 1998 Act. Although § 51.102 may be valid on its face, this would not necessarily doom Amfac's as-applied challenge.

■ With this in mind, we return to the concessioners' assertion that if "even one concessioner has [evidence showing an implied right of renewal], the regulations denying those rights across-the-board are unlawful." Brief for Appellants at 27. We do not need to choose between *Reno v. Flores* or *NCIR* to dispose of that contention. Not even First Amendment overbreadth analysis—which embodies a far more difficult standard for laws to satisfy than the one the Court formulated in *Salerno*—would render a law facially invalid because of the prospect of a single invalid application. An overbreadth attack will succeed only if the legislation is substantially overbroad—that is, only if the law "reaches a substantial number of impermissible applications." *New York v. Ferber*, 458 U.S. 747, 771, 102 S.Ct. 3348, 3362, 73 L.Ed.2d 1113 (1982). That there might be one invalid application is therefore far from enough to make the regulation unlawful under any of the standards we have mentioned.

Perhaps recognizing as much, the concessioners assert that "*some* contracts might *as a factual matter* include the [renewal] right as a bargained-for term," a "possibility" (despite obstacles posed by the parol evidence rule and perhaps statutes of fraud) they think is enough to render the regulation unlawful. Brief for Appellants at 29. But far more is demanded before a regulation may be declared facially invalid. Under *Reno v. Flores*, § 51.102 must of course be sustained on its face because there are circumstances in which applying the regulation would not be inconsistent with § 415 of the 1998 Act. The regulation's requirement of an express contract term, for instance, properly eliminates claims of an implied renewal right based on the *Christian* doctrine alone. Even under the more relaxed standard of *NCIR*, it is not enough that "*some* contracts might *as a factual matter*" contain an implied renewal right. To repeat, that "the regulation may be invalid as applied in some cases, however, does not mean that the regulation is facially invalid because it is without statutory authority." *NCIR*, 502 U.S. at 188, 112 S.Ct. at 555. We therefore reject the concessioners' facial attack on § 51.102.

In reaching this result we have followed a course different than that of the district court. We should explain why. The district court thought the "lawfulness of the defendants' regulations turns on whether

the plaintiffs each have a contractual right to preference renewal." 142 F.Supp.2d at 71. With this we agree. We also agree—as our discussion of the *Christian* doctrine indicates—with the district court's conclusion that the 1965 Act did not itself confer a contractual renewal right on the concessioners. *Id.* at 72. As to the concessioners' allegations that they had an implied-in-fact contract embodying their right of renewal, the court rejected these claims on the basis that "the administrative record provides no indication that the parties had the *mutual* understanding that the contract contained the renewal terms." *Id.* at 73. (The court must have had in mind all existing concession contracts, not just one.) The court added that the administrative record "is wholly devoid of information suggesting that the [Park Service] *intended* the renewal term to be part of the contract." *Id.* But that is entirely understandable in light of the fact that the Park Service's proposed rule dealing with rights of renewal did not contain the restriction requiring the renewal right to be spelled out as an express term. *See* Concessions Contracts, 64 Fed.Reg. 35,516, at 35,535 (proposed June 30, 1999). The concessioners thus had no reason to submit evidence of implied renewal rights in each of their contracts, assuming this sort of evidence would have been allowed in the rulemaking proceeding or could have been mustered. Moreover, the Park Service never indicated that its final regulation rested on the district court's rationale. *See SEC v. Chenery,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). After denying that the right could be inferred from the 1965 Act, the Park Service explained that an implied renewal right "is inconsistent with the express terms of almost all current NPS concession contracts," 65 Fed.Reg. at 20,633. Most contracts, according to the Park Service, contained a provision along these lines:

This Contract [or permit] and the administration of it by the Secretary shall be subject to the laws of Congress governing the Area and rules, regulations and policies whether now in force or hereafter enacted or promulgated.

*Id.* But that begs the question the concessioners posed here (and in the rulemaking, *see* Comments of the National Park Hospitality Ass'n at 23 (Oct. 14, 1999)). The savings clause of the 1998 Act is one of the "laws of Congress" to which this contractual provision refers. If a concessioner has an implied right of renewal in a pre–1998 contract, the savings clause preserves it. The Park Service does not deny the possibility of an implied contractual provision—that is, an unwritten one—in government contracts. *See* Willard L. Boyd, III & Robert K. Huffman, *The Treatment of Implied-in-Law and Implied-in-Fact Contracts and Promissory Estoppel in the United States Claims Court,* 40 CATH. U. L.REV. 605 (1991); Michael C. Walch, Note, *Dealing with a Not-so-Benevolent Uncle: Implied Contracts with Federal Government Agencies,* 37 STAN. L.REV. 1367 (1985). The district court, quoting *Hercules, Inc. v. United States,* 516 U.S. 417, 424, 116 S.Ct. 981, 985, 134 L.Ed.2d 47 (1996), summarized the law on the subject: an implied-in-fact contract requires a meeting of the minds, which may be inferred from the "conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding." The concessioners alleged that there have been such meetings of the mind, at least in some instances. Nonetheless, we agree with the district court that the regulation is facially valid. As we explained earlier, the possibility that one or some concessioners had an implied-in-fact renewal right is not a sufficient basis for holding § 51.102 of the regulations invalid on its face.

This still leaves the allegations in Amfac's complaint that § 51.102 was inconsistent with the savings clause of the 1998 Act as applied to Amfac's concession contract for the Grand Canyon. Complaint of Amfac Resorts at ¶¶ 21, 41. Amfac entered into that contract in 1969. The contract expired on December 31, 2001, after the district court's judgment. Amfac turned out to be the only offeror and so the government argues that its as-applied challenge to the right-of-renewal regulation is moot: "Amfac can have no 'preference' for [the Park Service] to consider when there are no other offerors." Brief for Appellees at 33. Even if Amfac eventually won the Grand Canyon contract, a subject about which we are not informed, we do not believe its as-applied challenge would necessarily be moot. Amfac argues that because § 51.102 threw its alleged implied renewal right in doubt, it "was forced to bid more generously for the Grand Canyon contract than it otherwise would have." Reply Brief for Appellants at 16. If this assertion can be proven, *see* *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), then Amfac continues to suffer an injury and the case is not moot. *See* *Scheduled Airlines Traffic Offices v. Dep't of Def.*, 87 F.3d 1356, 1358 (D.C.Cir.1996).

Amfac can succeed in its claim that the regulation is invalid as-applied to its 1969 Grand Canyon contract only if it can prove the essential predicate—that the regulation, in contradiction to the savings clause of the 1998 Act, deprived it of a contractual right. Amfac therefore should be allowed to adduce proof of its alleged implied right of renewal and should be permitted reasonable discovery to this end. The district court refused to allow any discovery on the ground that judicial review of the regulation must be confined to the administrative record, except in limited circumstances not presented here. 143 F.Supp.2d at 10–13. *See Am. Bank-*

*ers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266–67 (D.C.Cir.2001); *Esch v. Yeutter*, 876 F.2d 976, 991–92 (D.C.Cir. 1989). We said in *American Bankers*, with respect to a claim that a regulation conflicted with a statute, that the court did not even need the administrative record to determine the validity of the regulation. 271 F.3d at 266–67. But we were speaking there of a facial attack on the regulation. We agree with the district court's denial of discovery to that extent. Amfac's as-applied claim is another matter. Its evidence of an implied renewal right would not be presented to show what the Park Service did or did not consider in promulgating § 51.102 of the regulations. It would be presented instead to show that the regulation would deprive it of a contractual right in contravention of the savings clause in the 1998 Act. In this respect, the evidence Amfac proposes to adduce is akin to proof of its injury. Those challenging agency action must establish that they have standing and to do this, they must prove that the action causes injury to them. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. at 2136–37. They are not confined to the administrative record. Far from it. Beyond the pleading stage, they must support their claim of injury with evidence. *Id.* So here. In mounting an as-applied challenge to a regulation, whether in defense of an enforcement action or as here in an action for a declaratory judgment, the party making the challenge may—indeed, in most instances must—present evidence outside the administrative record to show why its particular circumstances render the regulation unlawful.

We therefore reverse the district court's grant of summary judgment on Amfac's as-applied challenge to the prospectus for concessions at the Grand Canyon National Park. In doing so, we recognize that one of the claims of another plaintiff, Hamilton

Stores, Inc., might be construed as an as applied challenge similar to that of Amfac. Complaint of Hamilton Stores, Inc. at ¶ 21. But the concessioners' brief presents no argument to this effect; in fact, neither the concessioners' brief nor their reply brief even mentions this portion of the Hamilton Stores complaint. We thus view the claim, which the district court rejected, as having been waived on appeal. *See, e.g., Doe v. Dist. of Columbia,* 93 F.3d 861, 875 n. 14 (D.C.Cir.1996) (per curiam).

## II.

### A.

■ The 1998 Act, as did the 1965 Act, recognized that the United States owns all capital improvements constructed on federal land within the National Park System. 16 U.S.C. § 5954(d). Nonetheless, the 1998 Act gave concessioners a "leasehold surrender interest" in any "capital improvement" the concessioner "constructs" "pursuant to a concession contract." 16 U.S.C. § 5954(a). The Act defines "capital improvement" as "a structure, fixture, or nonremovable equipment provided by a concessioner pursuant to the terms of a concession contract." 16 U.S.C. § 5954(e). When the concession contract expires or is terminated, the incumbent is entitled to receive from its successor (or the government) the value of this interest. 16 U.S.C. § 5954(c). The amount of each concessioner's "leasehold surrender interest"— or, as the parties call it, LSI—is "equal to the initial value (construction cost of the capital improvement), increased (or decreased)" by a percentage measured by the Consumer Price Index, less depreciation. 16 U.S.C. § 5954(a)(3). If the expiring concession contract is renewed, the concessioner's LSI carries over. 16 U.S.C. § 5954(b).

■ The plaintiff-concessioners are unhappy with the Park Service's regulations implementing these and other LSI provisions of the 1998 Act. They say that "'capital improvement' is a well-recognized technical accounting term that all companies, as a matter of financial reporting, tax accounting, and sound business practice use to distinguish upgrades to facilities from ordinary 'repair and maintenance' costs." Brief for Appellants at 41. For support they cite an affidavit from an accountant submitted by Amfac in the district court. But the district court refused to consider, in this facial challenge, affidavits not submitted as part of the administrative record, 142 F.Supp.2d at 73, and so shall we. Concessioners have not attempted to show why affidavits outside the agency record should be considered. *See* Steven Stark & Sarah Wald, *Setting No Records: The Failed Attempt to Limit the Record in Review of Administrative Action,* 36 ADMIN. L. REV. 333, 341–54 (1984). Still, we may acknowledge the standard accounting definition of capital expenditure—an expenditure that extends the useful life of the asset or increases the asset's value, and is not repair and maintenance. Whether an expenditure fits within the first category and thus must be depreciated or amortized, or the other category and thus must be expensed, often calls for difficult, fact-intensive judgments. *See* GLENN A. WELSCH & CHARLES T. ZLATKOVICH, INTERMEDIATE ACCOUNTING 443–46 (8th ed.1989); GARY L. SCHUGART, ET AL., SURVEY OF ACCOUNTING 197–212 (6th ed.1988); GLENN A. WELSCH & DANIEL G. SHORT, FUNDAMENTALS OF FINANCIAL ACCOUNTING 448–49 (5th ed.1987). As to tax accounting, which the concessioners invoke without any citation to the law, we think this is entirely beside the point. The tax code states that no deduction shall be allowed for "[a]ny amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." 26 U.S.C. § 263. In practice, there is a decided tilt to capi-

talizing many items because deductions are, as the Supreme Court put it in *IN-DOPCO, Inc. v. Commissioner,* 503 U.S. 79, 84, 112 S.Ct. 1039, 1042, 117 L.Ed.2d 226 (1992), "strictly construed." That rule of interpretation, of course, has no bearing on whether a particular expenditure by a concessioner should be treated as an addition to its LSI. Besides, we do not understand what the concessioners see as the problem here. The regulation of the Park Service repeats, word for word, the statute's definition of "capital improvement." *Compare* 16 U.S.C. § 5954(e) *with* 36 C.F.R. § 51.51. To the extent the concessioners are claiming that it was incumbent upon the Park Service to add a gloss to the statutory definition, a gloss drawn from accounting standards, they are mistaken, as the district court held. *See* 142 F.Supp.2d at 83. While agencies may have leeway in interpreting the statutes they administer, there is no rule of law compelling them to embellish what Congress has enacted.

 The concessioners also complain about § 51.67 of the regulations, 36 C.F.R. § 51.67, and the "Repair and Maintenance Reserve" in the Park Service's "Standard Concession Contract," 65 Fed.Reg. at 26,-069. Section 51.67 provides that concessioners do not earn LSI "for repair and maintenance of real property improvements unless a repair and maintenance project is a major rehabilitation." "Major rehabilitation" is defined in 36 C.F.R. § 51.51 as a pre-approved "comprehensive rehabilitation" project the "construction cost of which exceeds fifty percent of the pre-rehabilitation value of the structure." (The phrase "repair and maintenance" is not defined, in the regulations or in the 1998 Act.) The Standard Concession Contract requires concessioners to establish a reserve fund for repairs and maintenance projects, which "may include repair or replacement of foundations, building frames, window frames, sheathing, subfloors,

drainage, rehabilitation of building systems such as electrical, plumbing, built-in heating and air conditioning, roof replacement and similar projects." 65 Fed.Reg. at 26,069.

The concessioners object that § 51.67 allows LSI only for "projects costing more than 50% of a structure's replacement costs...." 36 C.F.R. § 51.67. What types of "projects" they do not say. If the project is a "capital improvement" it is added to the LSI no matter what the cost of construction. *See* 142 F.Supp.2d at 83. If the project is for repair and maintenance it does not qualify, as even the concessioners agree. The 50% regulation— § 51.67—deals with the question whether an outlay that would otherwise be considered an expenditure for repair and maintenance should constitute a capital improvement because, for instance, the repairs are so extensive. How a particular project should be classified will depend greatly on the particular facts, as it does even in tax cases. *See INDOPCO, Inc.,* 503 U.S. at 86, 112 S.Ct. at 1043. Nonetheless, the parties quarrel about hypothetical projects. The Park Service says that if a concessioner replaced a damaged dry wall or a rotted beam in a building these would not qualify as capital improvements and thus would not be included in the concessioner's LSI. Brief for Appellees at 36; 65 Fed.Reg. at 20,656. The concessioners argue that the cost of replacing a hotel's brick fireplace would be included. 142 F.Supp.2d at 83. Replacement of a foundation, according to the concessioners, also would clearly be a capital improvement; according to the Park Service it would not qualify because a foundation is "merely a component of a structure," rather than a "structure, fixture or nonremoveable equipment." *Compare* Brief for Appellants at 44 *with* Brief for Appellees at 39. This last dispute arises because the repair and maintenance reserve clause in the

standard contract mentions foundations. But all the clause says is that repair and maintenance "may" include repair or replacement of foundations. 65 Fed.Reg. at 26,069.

The district court, after considering these arguments and others, thought it could not give a definitive answer to the issues thus posed. Echoing *Reno v. Flores,* 507 U.S. at 301, 113 S.Ct. at 1446, and *NCIR,* 502 U.S. at 188, 112 S.Ct. at 555, without citing the cases, the court ruled as follows: "the Court cannot say that the regulation, on its face, will be unlawful in its every application. Thus, this challenge to the regulation must fail." 142 F.Supp.2d at 85. The court was referring only to the concessioners' attack on the "Repair and Maintenance Reserve" clause but we think its reasoning applies equally to the 50% rule in § 51.67. It is entirely possible that a project calling for repairs to a roof, the replacement of floor boards, the renovation of wiring and plumbing, and so forth would not ordinarily qualify as a "capital improvement." Yet if the total cost of the repair project exceeded 50% of the pre-repair value of the structure it would be added to the LSI. *See* 36 C.F.R. §§ 51.51, 51.67. In that circumstance a concessioner would have no cause for complaint. On the other hand, if the rehabilitation project satisfied the statutory and regulatory definition of a "capital improvement" it would be unlawful for the Park Service to invoke § 51.67 and refuse to treat the expenditure as an addition to the concessioner's LSI. We do not suggest that the Park Service would do anything of the sort. *See* 65 Fed.Reg. at 20,656–57. Our point is that on the face of the regulations, the most we can imagine is that in some applications—depending on how the Park Service administers the LSI regulations—there may be a conflict with the statute. That is not a sufficient basis for holding the regulations unlawful on

their face, for the reasons given in part I.B. of this opinion.

## B.

■■■ The concessioners have two other problems with the LSI regulations. The first relates to 16 U.S.C. § 5954(a)(3) and the valuation of LSI: each concessioner's "leasehold surrender interest is equal to the initial value (construction cost of the capital improvement), increased (or decreased)" by a percentage measured by the Consumer Price Index, less depreciation. The implementing regulation, 36 C.F.R. § 51.51, defines "construction cost" as "the total of the incurred eligible direct and indirect costs necessary for constructing or installing the capital improvement...." "Eligible direct and indirect costs" are costs "in amounts no higher than those prevailing in the locality of the project," *id.* It is this "locality" limitation to which the concessioners object. Projects in national parks, they tell us, are almost always more expensive to construct than "similar private projects in nearby localities, and Congress could not reasonably have intended that concessioners swallow such costs without LSI credit," a point the Park Service does not dispute. Brief for Appellants at 47–48. But as the Park Service points out, the concessioners' argument assumes that "locality" means outside the national park. The regulations do not so state and we see no basis for indulging in that assumption. It may be that the Park Service's particular interpretation regarding a particular project in a particular national park could unreasonably limit the valuation of a concessioner's LSI. But that is no reason to hold that the regulation conflicts with the statute or that it is arbitrary. If a concessioner has its own construction company, as some apparently do, nothing in the 1998 Act requires the Park Service to accept whatever amount the concessioner decides to

charge itself for the construction work. *See* 65 Fed.Reg. at 20,651. Like the district court, we therefore sustain the regulation.

■ The concessioners' remaining problem with the LSI regulations deals with 16 U.S.C. § 5954(a)(5): if the concessioner "makes a capital improvement to an existing capital improvement in which the concessioner has a leasehold surrender interest, the cost of such additional capital improvement shall be added to the then current value of the concessioner's leasehold surrender interest." Their claim is that § 51.65 of the regulations conflicts with this provision. The regulation states:

> A concessioner that replaces an existing fixture in which the concessioner has a leasehold surrender interest with a new fixture will increase its leasehold surrender interest by the amount of the construction cost of the replacement fixture less the construction cost of the replaced fixture.

36 C.F.R. § 51.65. This regulation is unlawful, according to the concessioners, because there is nothing in the statute allowing subtractions from a concessioner's LSI. They also believe the calculations required by the regulation would be an administrative nuisance. In the Grand Canyon concession, for instance, there are about 300 structures with many thousands of fixtures.

The district court sustained the regulation for reasons given by the Park Service, reasons we also find persuasive. Without the regulation, concessioners would receive a windfall every time they removed a fixture and replaced it with a new one:

> If a [concessioner] with a leasehold surrender interest in the hotel were to replace the hotel furnace once every five years for 15 years, the plaintiffs' proposed accounting would be to increase the leasehold surrender interest three separate times by the cost of the fur-

nace. Under this approach, the [concessioner] would hold a leasehold surrender interest equal to four furnaces, even though the hotel would only contain one.

142 F.Supp.2d at 88 n. 16. As to the concessioners' textual argument, it is true that the statute speaks only of additions not subtractions. But under the regulation the calculation is of net additions to LSI—the difference between the cost of the new fixture and the discarded one. When concessioners replace fixtures for a greater cost, their LSI will increase. The regulation deals with how much the increase should be. The statute, which speaks in terms of additions not replacements, does not address that subject. We therefore reject the concessioners' argument that § 51.65 of the regulations is inconsistent with 16 U.S.C. § 5954(a)(5). We reject as well their argument that the regulation is unreasonable. The Park Service's policy of avoiding the windfalls that would result without the regulation is reason enough to sustain § 51.65, despite the administrative burdens it may generate.

### III.

The concessioners claim the Park Service wrongly excluded concessions contracts from coverage under the Contract Disputes Act, 41 U.S.C. § 601 *et seq. See* 36 C.F.R. § 51.3; 65 Fed.Reg. at 20,635.

■ Enacted in 1978, the Contract Disputes Act provides an alternative forum for government contract disputes. Rather than seeking judicial relief in the Court of Federal Claims, a contractor may appeal decisions by a contracting official to an administrative board within that agency. 41 U.S.C. § 607. The board's decision may be appealed to the U.S. Court of Appeals for the Federal Circuit. 41 U.S.C. § 607(g).

Section 51.3 of the regulations states that concession contracts are not "con-

tracts" within the meaning of the Contract Disputes Act. 36 C.F.R. § 51.3 (2000). With this we agree. The Act applies to any "express or implied contract" for the "procurement" of "property," "services" or "construction." 41 U.S.C. § 602(a)(2). A procurement contract, the Park Service reasoned, "is a contract for which the government bargains for, and pays for, and receives goods and services." 65 Fed.Reg. at 20,635. Concession contracts are not of that sort. Their function is not to procure services or goods for the government. Instead, as the Park Service put it, concession contracts "authorize third parties to provide services to park area visitors." Id. While the Park Service does not administer the Contract Disputes Act, and thus may not have interpretative authority over its provisions, its reasoning finds support not only in the terms of that statute but also in the National Parks Omnibus Management Act of 1998, under which the Park Service may enter into concession contracts "to authorize a person, corporation or other entity to provide accommodations, facilities and services to visitors to" national parks. 16 U.S.C. § 5952. The Committee reports accompanying the 1998 Act also concluded that concession "contracts do not constitute contracts for the procurement of goods and services for the benefit of the government or otherwise," S.Rep. No. 105–202, at 39 (1998); H.R.Rep. No. 105–767, at 43 (1998), a position the Park Service had reached earlier with respect to concession contracts under the 1965 Act. See, e.g., Concessions Contracts and Permits, 57 Fed.Reg. 40,496, at 40,498 (Sept. 3, 1992) (reiterating that the Park Service "has never considered [concessions contracts] a type of federal procurement contract"). The Court of Federal Claims, considering the nature of concession contracts, also concluded that "this arrangement does not constitute. a procurement, but is a grant of a permit to operate a business." YRT Servs. Corp. v. United States, 28 Fed. Cl. 366, 392 n. 23 (1993). The decision rested, in part, on the fact that "the government is not committing to pay out government funds or incur any monetary liability." Id.

As against this analysis, the concessioners cite several decisions of the Interior Department Board of Contract Appeals [IBCA], a body created by Interior Department regulations, see 41 U.S.C. § 607(a); 43 C.F.R. § 4.100 et seq. (2000). The IBCA has held that the Contract Disputes Act applies to concession contracts. See, e.g., Appeal of Watch Hill Concession, Inc., IBCA No. 4284–2000, 2001 WL 170911 (2001); Appeal of Nat'l Park Concessions, Inc., IBCA No. 2995, 1994 WL 462401 (1994). But the decisions of this body "on any question of law shall not be final or conclusive." 41 U.S.C. § 609(b). And the IBCA's rationale for determining that concession contracts are procurement contracts is flawed. In its first opinion to consider the issue, the IBCA acknowledged that the Contract Disputes Act does not cover all contracts but then assumed that the Act does apply unless coverage is explicitly foreclosed. See Appeal of R & R Enters., IBCA No. 2417, 1989 WL 27790, at 24–25 (Mar. 24, 1989). Nothing in the Act suggests such a sweeping presumption. Another IBCA opinion states that if any "benefit" can be traced to the government, then the Contract Disputes Act must apply. Appeal of Nat'l Park Concessions, Inc., IBCA No. 2995, 1994 WL 462401, at 14 (Aug. 18, 1994). The primary purpose of concessions contracts is to permit visitors to enjoy national parks in a manner consistent with preservation of the parks. 16 U.S.C. § 5951. That the government receives monetary compensation or incidental benefits from the concessioners' performance is not enough to sweep these contracts into the ambit of the Contract Disputes Act.

## IV.

The concessioners' last complaint deals with the portion of the new regulations designed to deal with transactions involving corporate concessioners (*see* 65 Fed. Reg. at 20,661). One of the regulations states:

> The concessioner may not assign, sell, convey, grant, contract for, or otherwise transfer (such transactions collectively referred to as "assignments" for purposes of this part), without the prior written approval of the Director, any of the following:
>
> (a) Any concession contract;
>
> . . .
>
> (c) Any controlling interest in a concessioner or concession contract;
>
> . . .

36 C.F.R. § 51.85(a) & (c). A similar regulation prohibits, without prior approval, any "encumbrance" of a "controlling interest in a concessioner." 36 C.F.R. § 51.86(c). In the concessioners' view, the regulations extend beyond the statute. The 1998 Act forbids any "concessions contract" from being "transferred, assigned, sold, or otherwise conveyed or pledged by a concessioner" without government approval. 16 U.S.C. § 5957(a). Approval must be given unless "the entity seeking to acquire a concessions contract is not qualified" or the transfer or conveyance would otherwise adversely affect performance of the contract in a manner specified in 16 U.S.C. § 5957(b). The crucial difference between the regulations and the statute, the concessioners say, is that the regulations require approval of transactions dealing not only with the transfers or assignments of concession contracts but also with changes in control of the concessioner. The Park Service responds that its change-of-control rule ensures that unqualified persons do not wind up holding concession contracts. Unlike individuals, a corporation can in effect transfer a conces-

sion contract by selling its stock to another entity. 65 Fed.Reg. at 20,661. As the Park Service sees it, the regulations are a permissible construction of the statutory phrase "otherwise conveyed or pledged," an argument with which the district court agreed. 142 F.Supp.2d at 90–91.

█ How the Park Service regulations will operate does not exactly leap from the pages of the Federal Register. It is easy enough to see that if X corporation wanted to sell all its assets, including its concession contract, it would first have to get approval of the Director of the Park Service. No one doubts that the regulation properly requires as much. The Park Service also believes that if the non-public X corporation structured the transaction as a sale of 100% of its stock instead of an asset sale, there would be no functional difference as far as the concession contract is concerned. *See Alarm Indus. Communications Comm. v. FCC,* 131 F.3d 1066, 1070–71 (D.C.Cir.1997). It is only a short leap to the conclusion that if, rather than a sale of 100% of the stock, X corporation sold some lesser amount representing a controlling interest, this too should require prior approval. The regulations define controlling interest in much the same manner as the Securities and Exchange Commission, *see, e.g.,* 17 C.F.R. § 210.1–02(g), that is, not in terms of any particular percentage of outstanding voting stock. Rather, a "controlling interest" in a corporate concessioner constitutes "sufficient outstanding voting securities" of "the concessioner or related entities that permits the exercise of managerial authority" over the concessioner. 36 C.F.R. § 51.84.

Beyond these simple examples we enter a vale of ambiguity. Transactions of the sort just described are not the focus of the concessioners' concern. Their problem is that the regulations—as they read them— require Park Service approval of transac-

tions undertaken by the concessioners' "shareholders or their affiliates." Brief for Appellants at 55. But do they? The shareholders of incorporated concessioners are typically not individuals but parent corporations. The Park Service reports that "many" of its concessioners "are corporations that hold a concession contract as their exclusive business activity" and that almost all of the largest concessioners are "wholly owned subsidiaries of larger corporations." 65 Fed.Reg. at 20,661. One of the plaintiffs here, ARAMARK Sports and Entertainment Services, Inc., is a wholly-owned subsidiary of ARA-MARK/HMS Company, which is a wholly-owned subsidiary of ARAMARK Sports and Entertainment Group, Inc., which is a wholly-owned subsidiary of ARAMARK Corporation, which is listed on the New York Stock Exchange. Brief for Appellants at iv.

Wholly-owned means, in the case of incorporated subsidiaries, that the parent corporation holds all of the subsidiary corporation's stock. What worries the concessioners is that transactions by the parent could potentially require Park Service approval if a change in control would result. But the regulations do not read that way. The critical provision is 36 C.F.R. § 51.8. It speaks only of sales, assignments, conveyances and so forth by the "concessioner." The term "concessioner," in regulatory parlance, "is an individual, corporation, or other legally recognized entity that duly holds a concession contract," 36 C.F.R. § 51.3—a definition that at least on its face encompasses only the subsidiary corporation, not the parent. It therefore appears that if the parent corporation engages in a sale-of-control transaction, this would not require approval because the concessioner—the subsidiary corporation—would not be doing the selling. The attorneys for the Park Service say, in their brief, that the regulations do indeed cover transactions by the corporate concession-

er's parent company. Brief for Appellees at 53–54. But they do not parse the language of the regulations, and they point to nothing in the Park Service's explanation of its regulations that goes so far. In fact, the Park Service justified its regulations on the basis that it would be "anomalous" if a "corporate concessioner" could sell "its stock to a new party (sale of a controlling interest)" without having to seek Park Service approval. 65 Fed.Reg. at 20,661. If, despite the language of the regulations, transactions at the parent level are also supposed to be covered, we are far from certain how the Park Service intends to implement its rules. An investor might begin purchasing stock of the parent corporation of a corporate-concessioner on the open market. Must the concessioner corporation go to the Park Service and ask for approval of the outsider's purchases of the parent when the outsider's percentage of the outstanding shares reaches some magic number? That makes no sense. Neither the concessioner corporation nor the parent corporation has any control over the purchaser. Perhaps this is why the regulation seems to speak only in terms of the concessioner selling its stock. If the regulations do not cover the transaction just mentioned, but do cover a sale of control by a parent corporation, the Park Service would have to justify a rule that allows an outsider, a complete stranger, to gain a "controlling interest" through open market purchases but requires approval before the parent makes a block sale to the same person. Control of the parent, and thus of the subsidiary concessioner, would transfer in both situations, and under the Park Service's theory, so would the concession contract, yet the one transaction would be regulated and the other not.

The short of the matter is that we do not know whether the problems the concessioners identify exist. We cannot be sure that the Park Service will apply its sale-of-

control regulations to transactions involving only sales of stock *by* corporate concessioners (as distinguished from open market sales by shareholders or sales by a parent company of its stock). The questions thus raised, and the other questions posed by the many possible forms of corporate restructuring (*see, e.g.,* 1 MARTIN D. GINSBURG & JACK S. LEVIN, MERGERS, ACQUISITIONS, AND BUYOUTS ¶ 105 (2001)), present "too many imponderables" to permit judicial review at this time. *Clean Air Implementation Project v. EPA,* 150 F.3d 1200, 1205 (D.C.Cir.1998). This aspect of the case, in other words, is not ripe. *See Media Access Project v. FCC,* 883 F.2d 1063, 1070 (D.C.Cir.1989). The "classic institutional reason" for postponing review is the "need to wait for a 'rule to be applied [to see] what its effect will be,'" *Louisiana Envtl. Action Network v. Browner,* 87 F.3d 1379, 1385 (D.C.Cir.1996) (quoting *Diamond Shamrock Corp. v. Costle,* 580 F.2d 670, 674 (D.C.Cir.1978)). The issues here can be presented in a more "concrete" setting. *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Ass'n of Am. R.R.,* 146 F.3d 942, 946 (D.C.Cir.1998). The regulations state that "[a]ssignments" without the prior approval of the Park Service will be considered "null and void" and will be viewed as a "material breach of the applicable concession contract which may result in termination of the contract for cause." 36 C.F.R. § 51.88. Whether this means the Park Service will deem transfers of controlling interests in a concessioner's parent as "null and void" is not at all clear. But the prospect certainly can give rise to an interested party's seeking the Park Service's judgment that its proposed transaction does not need approval. A lawsuit could be brought if the concessioner is dissatisfied with the answer. Then at least the court would have some idea of what the Park Service thinks its regulations cover. Then too the validity of the regulations, as thus interpreted, could be determined in light of the language of the statute, which speaks only of transfers of concession contracts.

The possible hardship to the concessioners in waiting does not alter our conclusion that the issues are not ripe. No concessioner has indicated that a transfer of control is imminent. We therefore have no reason to believe that in the immediate future they will have to alter their conduct to their disadvantage. *Contrast Abbott Labs.,* 387 U.S. at 152, 87 S.Ct. at 1517. It may be that matters cannot be sorted out without further litigation but that is not the sort of hardship we recognize in evaluating whether a case is ripe for review. *See, e.g., Clean Air Implementation Project,* 150 F.3d at 1206.

Our conclusion that this aspect of the case is not ripe differs from that of the district court, which ruled against the concessioners' claim on its merits. We therefore vacate the district court's judgment in this respect.

\* \* \*

The judgment of the district court is affirmed in part, reversed in part and vacated in part. The case is remanded for further proceedings, consistent with this opinion, on Amfac's as-applied challenge to regulations concerning the preferential right of renewal.

*So ordered.*